The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
November 15, 2018

## 2018COA163

**No. 17CA2090 People in Interest of M.V. — American Indian Law — ICWA — Placement of Indian Children — Foster Care or Preadoptive Placements; Juvenile Court — Dependency and Neglect**

A division of the court of appeals considers two questions of first impression regarding the application of the foster care placement provisions of the Indian Child Welfare Act of 1978 (ICWA) to a dependency and neglect proceeding. First, the division concludes that a lack of compliance with ICWA's foster care placement provisions does not deprive a juvenile court of jurisdiction to enter adjudicatory and dispositional orders. Second, the division determines that ICWA's foster care placement provisions apply to a dispositional order, but not an order adjudicating a child dependent and neglected. Because the record

does not demonstrate compliance with ICWA, the division reverses the dispositional order.

In addition, the division concludes that the juvenile court erred in admitting video recordings of mother and the children at the adjudicatory jury trial when there was no evidence establishing the accuracy of the scenes depicted in the recordings or the accuracy of the recording process.  The division further concludes that the erroneous admission of the recordings substantially influenced the jury's verdict and, thus, was not harmless.  As a result, the division reverses the adjudicatory order.

COLORADO COURT OF APPEALS      **2018COA163**

Court of Appeals No. 17CA2090
El Paso County District Court No. 17JV1116
Honorable Theresa M. Cisneros, Judge

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of M.V.; Ma.M.; P.M., a/k/a P.P.; and Mo.M., a/k/a M.M-B.,
Children,

and Concerning M.M.,

Respondent-Appellant.

ORDERS REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE DAILEY
Lichtenstein and Ashby, JJ., concur

Announced November 15, 2018

Amy R. Folsom, County Attorney, Kevin G. Webster, Assistant County Attorney,
Colorado Springs, Colorado, for Petitioner-Appellee

Anna N.H. Ulrich, Guardian Ad Litem

Davide C. Migliaccio, Office of Respondent Parents' Counsel, Colorado Springs,
Colorado, for Respondent-Appellant

¶ 1    In this dependency and neglect proceeding, M.M. (mother) appeals the juvenile court's judgment of adjudication and disposition following a jury trial.  To resolve mother's arguments on appeal, we must delve into the provisions of the Indian Child Welfare Act of 1978 (ICWA).  ICWA establishes standards that must be followed when a state court places an Indian child in a foster care placement.

¶ 2    However, we must decide an unanswered question in Colorado: whether a juvenile court lacks subject matter jurisdiction to enter adjudicatory and dispositional orders when it has not complied with ICWA.  We must also determine whether ICWA's provisions regarding foster care placement apply to adjudicatory and dispositional orders.  Ultimately, we conclude that (1) a lack of ICWA compliance does not deprive a juvenile court of subject matter jurisdiction and (2) ICWA's foster care placement provisions apply to a dispositional order, but not to an order adjudicating a child dependent and neglected.

¶ 3    We then examine mother's argument that the juvenile court erred in admitting video recordings of mother and the children at the adjudicatory trial.  We agree that the court erred in admitting

the recordings without proper authentication and further conclude that the error was not harmless. As a result, we reverse the adjudication and dispositional orders and remand the case to the juvenile court.

## *I. Background*

¶ 4 In August 2017, the El Paso County Department of Human Services (the Department) initiated a dependency and neglect case regarding seven-month-old M.V., six-year-old Ma.M., and an older half-sibling who is not subject to the appeal. Later that month, the Department filed an amended petition adding mother's other two children who had been in the care of the maternal grandmother — nine-year-old P.M., also known as P.P., and thirteen-year-old Mo.M., also known as M.M-B. (collectively the children).

¶ 5 In support of the petition, the Department asserted that

- it had received videos showing mother using methamphetamine as well as manufacturing and selling a white powder;

- mother had a history of substance use and was on probation for possession of a controlled substance; and

2

- M.V. was present during domestic violence between mother and his father.

¶ 6 Mother denied the allegations and requested a jury trial. At the conclusion of the trial, the jury found that mother had subjected the children to mistreatment or abuse, the children lacked proper parental care as a result of mother's acts or failures to act, and the children's environment was injurious to their welfare.

¶ 7 Based on the jury's verdict, the juvenile court adjudicated the children dependent and neglected. Following another hearing, the juvenile court entered a dispositional order that adopted a treatment plan for mother. And, as part of the dispositional order, the juvenile court placed Ma.M. in the custody of her father, P.M. in a relative's custody, and M.V. and Mo.M. in the Department's custody.

## II. ICWA

¶ 8 Mother contends that the record does not demonstrate compliance with ICWA's provisions and, as a result, the juvenile court lacked subject matter jurisdiction to adjudicate the children and enter a dispositional order. Specifically, mother asserts that (1)

notice was not given to the applicable tribes; (2) the court failed to require qualified expert testimony of emotional or physical damage to the children; and (3) the court failed to consider whether the Department had made active efforts to rehabilitate mother. We reject mother's jurisdictional argument but agree that the dispositional order must be reversed to ensure ICWA compliance.

## A. Subject Matter Jurisdiction

¶ 9    We first consider whether the juvenile court's purported failure to comply with ICWA's provisions deprived it of subject matter jurisdiction over the proceeding.

¶ 10    ICWA's provisions, 25 U.S.C. §§ 1901-1963 (2018), are for the protection and preservation of Indian tribes and their resources, and to protect Indian children who are members of or are eligible for membership in an Indian tribe. 25 U.S.C. § 1901(2), (3) (2018). ICWA also recognizes that Indian tribes have a separate interest in Indian children that is equivalent to, but distinct from, parental interests. *B.H. v. People in Interest of X.H.*, 138 P.3d 299, 303 (Colo. 2006); *see also Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 52 (1989). To effectuate this purpose, it establishes

4

federal standards for child custody proceedings involving Indian children. 25 U.S.C. § 1902 (2018).

¶ 11 Central to ICWA are its provisions governing jurisdiction over child custody proceedings involving Indian children. *Holyfield*, 490 U.S. at 36. 25 U.S.C. § 1911 (2018) of ICWA creates a "dual jurisdictional scheme" for Indian child custody proceedings. *Holyfield*, 490 U.S. at 36. In certain circumstances, ICWA provides for exclusive tribal jurisdiction over Indian children. 25 U.S.C. § 1911(a); *Holyfield*, 490 U.S. at 36. In other circumstances, ICWA creates concurrent subject matter jurisdiction in state and tribal courts. 25 U.S.C. § 1911(b); *Holyfield*, 490 U.S. at 36. In that sense, ICWA is a jurisdictional statute.

¶ 12 However, in addition to the jurisdictional provisions, ICWA sets forth procedural and substantive standards that apply when child custody proceedings concerning Indian children occur in state courts. *Holyfield*, 490 U.S. at 36; *see also B.H.*, 138 P.3d at 302. Among other things, the procedural standards require that the applicable tribe or tribes receive notice of the termination proceeding and of their right to intervene. 25 U.S.C. § 1912(a) (2018); *Holyfield*, 490 U.S. at 36.

5

¶ 13    Significantly, the remedy that Congress has provided for a failure to comply with ICWA's provisions, including its notice provisions, is to allow an Indian child, parent, or tribe to petition to invalidate the termination judgment.  25 U.S.C. § 1914 (2018).  But, the remedy does not void the court's subject matter jurisdiction.  *In re Antoinette S.*, 129 Cal. Rptr. 2d 15, 24 (Cal. Ct. App. 2002); *see also Carson v. Carson*, 13 P.3d 523, 526 (Or. Ct. App. 2000).  And, there is a substantial difference between a lack of subject matter jurisdiction that deprives the court of its ability to act and a mistake in the exercise of established jurisdiction.  *Antoinette S.*, 129 Cal. Rptr. 2d at 23.

¶ 14    Several other jurisdictions have reached a similar conclusion. The fourth district of the California Courts of Appeal held that a court's failure to comply with ICWA's notice provisions did not constitute jurisdictional error.  *Id.* at 24; *see also In re K.B.*, 93 Cal. Rptr. 3d 751, 758 (Cal. Ct. App. 2009).  The Missouri Court of Appeals determined that a trial court was not divested of subject matter jurisdiction even if it erred in ruling that ICWA did not apply.  *In Interest of S.A.M.*, 703 S.W.2d 603, 606 (Mo. Ct. App. 1986).

¶ 15    Similarly, the Oregon Court of Appeals concluded that when the state court (as opposed to a tribal court) had properly exercised jurisdiction over a proceeding, the court was not divested of subject matter jurisdiction simply because it failed to comply with ICWA. *State ex rel. Juvenile Dep't v. Charles*, 688 P.2d 1354, 1360 n.5 (Or. Ct. App. 1984).  And, the Michigan Supreme Court declined to adopt the argument that the mere triggering of the notice requirements under 25 U.S.C. § 1912(a) stripped the court of jurisdiction over the proceeding.  *In re Morris*, 815 N.W.2d 62, 80 (Mich. 2012).

¶ 16    We recognize that two courts have held that a failure to comply with ICWA divests a court of subject matter jurisdiction. The South Dakota Supreme Court determined that ICWA was primarily a jurisdiction statute, and, thus, inadequate notice to the appropriate tribes divested the trial court of jurisdiction to terminate parental rights to Indian children.  *In re N.A.H.*, 418 N.W.2d 310, 311 (S.D. 1988).  Similarly, the fifth district of the California Courts of Appeal recognized that state courts have no subject matter jurisdiction to proceed with dependency proceedings concerning a possible Indian child until at least ten days after the

tribe has received notice of the proceeding. *In re Desiree F.*, 99 Cal. Rptr. 2d 688, 699 (Cal. Ct. App. 2000).

¶ 17    However, another district of the California Court of Appeal observed that the jurisdictional statement in *Desiree F.* was made in passing and appeared to have been a shorthand way of saying that the ICWA violation constituted serious legal error. *Antoinette S.*, 129 Cal. Rptr. 2d at 22-23. And, as previously discussed, multiple other courts have reached the opposite conclusion of *N.A.H.* and *Desiree F.* and determined that a failure to comply with ICWA's notice provisions does not divest a court of subject matter jurisdiction.

¶ 18    Finally, we note that mother also relies on *In Interest of J.W.*, 498 N.W.2d 417 (Iowa Ct. App. 1993), to support her jurisdictional argument. In *J.W.*, the Iowa Court of Appeals noted that there was authority supporting a finding that ICWA was jurisdictional and failure to give adequate notice to the tribes divested a state court of subject matter jurisdiction. *Id.* at 419. But, the Iowa Supreme Court has subsequently disavowed *J.W.* to the extent that it held that failure to give adequate notice divested a court of jurisdiction

to terminate parental rights. *In Interest of N.N.E.*, 752 N.W.2d 1, 10 n.3 (Iowa 2008).

¶ 19 Following the majority of states, we conclude that the juvenile court's asserted lack of compliance with ICWA's notice provisions under 25 U.S.C. § 1912(a) did not divest it of subject matter jurisdiction to enter the adjudicatory and dispositional orders.

### B. Personal Jurisdiction

¶ 20 In her reply brief, mother asserts that the juvenile court also lacked personal jurisdiction over the tribe, which became an indispensable party once ICWA's notice provisions were triggered. However, because mother raised this issue for the first time in her reply brief, the issue is not properly before us and thus we decline to address it. *See People v. Czemerynski*, 786 P.2d 1100, 1107 (Colo. 1990); *In re Marriage of Smith*, 7 P.3d 1012, 1017 (Colo. App. 1999).

### C. ICWA's Provisions

¶ 21 Next, we must determine whether the record demonstrates compliance with ICWA's provisions, and, if not, whether the adjudicatory and dispositional orders must be reversed.

## 1. The Legal Framework

¶ 22    Recall that ICWA establishes minimum federal standards to be followed when an Indian child is involved in a child custody proceeding. *People in Interest of C.A.*, 2017 COA 135, ¶ 8. A child custody proceeding includes a foster care placement. 25 U.S.C. § 1903(1)(i) (2018); *C.A.*, ¶ 9. ICWA also applies to an action that may result in foster care placement, even if it ultimately does not. *People in Interest of K.G.*, 2017 COA 153, ¶ 14; 25 C.F.R. § 23.2 (2018).

¶ 23    Under these circumstances, when the court knows or has reason to know or believe that an Indian child is involved in a child custody proceeding, including foster care placement, the party seeking the foster care placement must provide notice to the potentially concerned tribe or tribes. *B.H.*, 138 P.3d at 302; *see also* 25 U.S.C. § 1912(a); § 19-1-126(1)(b), C.R.S. 2018.

¶ 24    An Indian child is defined as an unmarried person under the age of eighteen who is either (1) a member of an Indian tribe or (2) the biological child of a tribal member and eligible for membership in a tribe. 25 U.S.C. § 1903(4). But ICWA does not define tribal membership. *B.H.*, 138 P.3d at 303. Rather, membership is left to

10

the province of each individual tribe.  *Id.*  For example, an individual tribe's criteria for membership may or may not include formal enrollment or registration.  *Id.*

¶ 25    Additionally, because Indian tribes have a separate interest in Indian children, they must have a meaningful opportunity to participate in determining whether a child is an Indian child and to be heard regarding ICWA's applicability.  *Id.*

¶ 26    To adhere to ICWA's notice provisions, the Department must directly notify the tribe by registered mail with return receipt requested of the pending child custody proceeding and its right to intervene.  *People in Interest of L.L.*, 2017 COA 38, ¶¶ 34-35.  The Department should try to provide sufficient information to the tribe for it to determine whether the child is a member or eligible for membership.  *Id.* at ¶ 37.

¶ 27    In 2016, the Bureau of Indian Affairs (BIA) issued regulations and new guidelines clarifying ICWA's notice requirements.  *People in Interest of L.H.*, 2018 COA 27, ¶ 6; Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778 (June 14, 2016); BIA Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016), https://perma.cc/3TCH-8HQM (2016 Guidelines); *see also* Notice

of Guidelines for Implementing the Indian Child Welfare Act, 81 Fed. Reg. 96,476 (Dec. 30, 2016).  Although the 2016 Guidelines are not binding, they provide useful guidance in interpreting ICWA. *L.H.*, ¶ 6.

¶ 28     Under the regulatory scheme, the notice sent to an Indian tribe must include the following:

> (1) The child's name, birthdate, and birthplace;
>
> (2) All names known (including maiden, married, and former names or aliases) of the parents, the parents' birthdates, and birthplaces, and Tribal enrollment numbers if known;
>
> (3) If known, the names, birthdates, birthplaces, and Tribal enrollment information of other direct lineal ancestors of the child, such as grandparents; [and]
>
> (4) The name of each Indian Tribe in which the child is a member (or may be eligible for membership if a biological parent is a member)[.]

25 C.F.R. § 23.111(d)(1)-(4) (2018).  The notice must also include a copy of the petition, complaint, or other document by which the child custody proceeding was initiated and, if a hearing has been scheduled, information on the date, time, and location of the hearing, and various statements related to the tribe's right to

12

intervene and petition for a transfer to a tribal court. 25 C.F.R. § 23.111(d)(5)-(6). And, copies of these notices must be sent to the appropriate regional director of the BIA. 25 C.F.R. § 23.11(a) (2018).

¶ 29 The 2016 Guidelines recognize that in some instances the child or parent may not be certain of his or her membership status in an Indian tribe but may indicate he or she is somehow affiliated with a tribe or group of tribes. 2016 Guidelines at 18. To assist in identifying federally recognized tribes and their agents for service, the BIA publishes a list of recognized tribes and their agents in the Federal Register by region and by historical tribal affiliation. *See* Designated Tribal Agents for Service of Notice, 82 Fed. Reg. 12,986, 13,009 (Mar. 8, 2017); List of Designated Tribal Agents by Tribal Affiliation, 82 Fed. Reg. 12,986, 13,009 (Mar. 8, 2017), https://perma.cc/K3DD-KQR5.

¶ 30 When, as here, the parent or his or her relative is only able to identify a tribal ancestral group, the Department must notify each of the tribes in that ancestral group in order for the tribes to identify whether the parent or child is a member of any such tribe. *L.H.,* ¶ 8.

¶ 31    Additionally, if the court has reason to know that the child is an Indian child, but it does not have sufficient evidence to determine whether the child is or is not an Indian child, the court must treat the child as an Indian child, unless and until it is determined on the record that the child is not an Indian child. 25 C.F.R. § 23.107(b)(2) (2018). Among other things, before ordering a foster care placement, the court must

- be satisfied that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful"; and
- make a determination, "supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

25 U.S.C. § 1912(d), (e).

¶ 32    Whether ICWA applies to a dependency and neglect case is a question of law that we review de novo. *See In re M.H.C.*, 381 P.3d 710, 712 (Okla. 2016); *see also People in Interest of T.M.W.*, 208

14

P.3d 272, 274 (Colo. App. 2009) (recognizing that whether ICWA's notice requirement was satisfied is a question of law that we review de novo).

## 2. *Application to Adjudicatory and Dispositional Orders*

¶ 33 A foster care placement under ICWA is "any action removing an Indian child" from his or her "parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated." 25 U.S.C. § 1903(1)(i); *C.A.*, ¶ 9.

¶ 34 The purpose of an adjudicatory trial is to determine whether the factual allegations in the dependency and neglect petition are supported by a preponderance of the evidence, and, thus, whether the status of the child warrants intrusive protective or corrective state intervention into the familial relationship. § 19-3-505(1), C.R.S. 2018; *People in Interest of S.G.L.*, 214 P.3d 580, 583 (Colo. App. 2009).

¶ 35 But, the purpose of adjudication is not to determine the children's placement. Indeed, while evidence tending to establish the necessity of separating a child from his or her parents may be

admitted at the adjudicatory hearing, it is not required for making an order of adjudication. § 19-3-505(2). Thus, an adjudicatory order does not constitute a foster care placement under ICWA.

¶ 36 True, another division of this court has reversed an adjudicatory order and remanded the case to ensure compliance with ICWA's notice requirements. *See L.L.*, ¶ 55. Yet, the same division also concluded that ICWA concerns the placement of Indian children in child custody proceedings, and an adjudicatory hearing is not a child custody proceeding under ICWA. *Id.* at ¶ 51. We agree with this conclusion.

¶ 37 However, a dispositional hearing serves a different purpose. Once a child has been adjudicated dependent and neglected, the court must hold a dispositional hearing and receive evidence on the proper disposition that will serve the best interests of the child and the public. §§ 19-3-507(1)(a), 19-3-508(1), C.R.S. 2018; *People in Interest of Z.P.S.*, 2016 COA 20, ¶ 14.

¶ 38 When, as here, the proposed disposition is not termination of parental rights, the court must approve an appropriate treatment plan that includes a provision concerning the child's placement. § 19-3-508(1)(a)-(c). The court may place the child in the legal

custody of one or both parents, a relative or other suitable person, or the Department for placement in a foster care home or other child care facility. *Id.* In short, as part of the dispositional order, the juvenile court must address the child's placement, which may include a foster care placement.

¶ 39    We recognize that the dispositional hearing is not necessarily the first time that a court will address whether a child needs to be in out-of-home placement. Often, as in this case, the court may place a child in a relative's custody or in foster care during a shelter or temporary custody hearing prior to adjudication and disposition. An earlier division of this court determined that a foster care placement under ICWA had occurred on the date that a protective order was entered that precluded the parent from removing the children from foster care. *People in Interest of J.L.G.*, 687 P.2d 477, 479 (Colo. App. 1984).

¶ 40    However, ICWA allows courts to issue temporary or emergency custody orders without making the findings required by 25 U.S.C. § 1912(d) and (e). *In re H.T.*, 343 P.3d 159, 168 (Mont. 2015); *In re Esther V.*, 248 P.3d 863, 872-73 (N.M. 2011). 25 U.S.C. § 1922 (2018) specifically provides that ICWA should not be construed to

prevent the emergency removal of an Indian child who is a resident of or domiciled on a reservation, or the emergency placement of the child in foster care when necessary to prevent imminent physical harm to the child.  Although this section only references Indian children who are residents of or are domiciled on an Indian reservation, its legislative history reveals that it was intended to apply to all Indian children.  *In re S.B.*, 30 Cal. Rptr. 3d 726, 735-36 (Cal. Ct. App. 2005); *see also Esther V.*, 248 P.3d at 873.

¶ 41    And orders entered during the temporary protective or shelter stage of a dependency and neglect proceeding are interim orders pending a final factual determination of the allegations in the petition.  *People in Interest of A.E.L.*, 181 P.3d 1186, 1191 (Colo. App. 2008).  They are not intended to determine a parent's legal interest in the child.  *W.H. v. Juvenile Court*, 735 P.2d 191, 193 (Colo. 1987).  Rather, the temporary protective or shelter hearing is a pre-adjudicatory procedure which arises from exigencies requiring temporary emergency measures designed to protect the welfare of the child pending further judicial proceedings.  *Id.*  In contrast, the dispositional hearing is the first time that the court addresses the

child's placement once it has gained authority to intervene in the familial relationship. *See Z.P.S.*, ¶ 13.

¶ 42    Accordingly, a dispositional order constitutes a child custody proceeding under ICWA.

### *3. Reason to Know*

¶ 43    A court "has reason to know" a child "is an Indian child if"

> (1) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that the child is an Indian child;
>
> (2) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child;
>
> (3) The child who is the subject of the proceeding gives the court reason to know he or she is an Indian child;
>
> (4) The court is informed that the domicile or residence of the child, the child's parent, or the child's Indian custodian is on a reservation or in an Alaska Native village;
>
> (5) The court is informed that the child is or has been a ward of a Tribal court; or
>
> (6) The court is informed that either parent or the child possesses an identification card indicating membership in an Indian Tribe.

25 C.F.R. § 23.107(c). State courts and agencies are encouraged to interpret these factors expansively. 2016 Guidelines at 11.

¶ 44   At the commencement of the case, mother completed an ICWA assessment form regarding Ma.M. and M.V. On the form, mother indicated that those children had American Indian heritage and were eligible for membership in a Lakota or Sioux tribe. The BIA's list of Tribal Agents by Affiliation contains no reference to a Lakota tribe, but it does identify multiple federally recognized Sioux tribes. *See* List of Designated Tribal Agents by Tribal Affiliation, 82 Fed. Reg. 12,986, 13,009 (Mar. 8, 2017), https://perma.cc/K3DD-KQR5. This information was sufficient to give the court reason to know the children were Indian children under 25 C.F.R. § 23.107(c)(2).

¶ 45   Yet, the record contains no indication that the Department gave notice of the dispositional hearing to the Sioux tribes. To be sure, the Department correctly asserts that mother had not complied with the juvenile's court earlier directive to complete a second ICWA assessment form. Be that as it may, mother's failure to comply did not eliminate the Department's duty to send notice of the proceeding to the tribal affiliations identified by mother. *See*

*People in Interest of J.O.*, 170 P.3d 840, 843 (Colo. App. 2007).  And, in response to the juvenile court's inquiry at the dispositional hearing, mother reported that the children had Apache and Sioux heritage.

¶ 46     Moreover, the juvenile court did not make the necessary findings under 25 U.S.C. § 1912(d) and (e) before it placed three of the children, P.M., M.V. and Mo.M., out of a parent's care (effectively a foster care placement under ICWA).

¶ 47     Under these circumstances, the record does not demonstrate compliance with ICWA, and we must therefore reverse the dispositional order.

### III.  *Admission of Video Recordings at the Adjudicatory Trial*

¶ 48     Mother contends that the juvenile court reversibly erred in admitting video recordings that had been anonymously provided to the Department and were not properly authenticated.  We agree.

### A.  *Legal Standard for Authentication*

¶ 49     Video recordings are ordinarily competent to illustrate or explain something that a witness could describe in words.  *People v. Armijo*, 179 P.3d 134, 137 (Colo. App. 2007).  However,

authentication is a condition precedent to admissibility. *People v. Baca*, 2015 COA 153, ¶ 26.

¶ 50 The burden to authenticate is not high and requires only a prima facie showing. *People v. Heisler*, 2017 COA 58, ¶ 7. Authentication is satisfied by evidence sufficient to support a finding that the evidence in question is what its proponent claims. CRE 901; *People v. Glover*, 2015 COA 16, ¶ 12.

¶ 51 To authenticate a video recording, the proponent needs to establish that the recording is an accurate reproduction of a scene with which the witness is familiar. *Armijo*, 179 P.3d at 136-38; *see also Baca*, ¶ 29. But, if no witness with independent knowledge of the content of the recording can verify the accuracy of the scene, the proponent may instead present a witness who can verify the reliability of the recording process, including the reliability of the recording system and the absence of any tampering with the recording. *See Baca*, ¶ 30 (applying the same principle to a recorded telephone call).

¶ 52 We review evidentiary rulings, including a trial court's determinations regarding foundation and authentication, for an abuse of discretion. *Id.* at ¶ 18. A court abuses its discretion when

its ruling is based on an erroneous understanding or application of the law or is manifestly arbitrary, unreasonable, or unfair. *Heisler*, ¶ 13.

### B. The Authentication of the Video Recordings

¶ 53 Before the jury trial, mother filed a motion in limine to exclude eleven video recordings — ten that purported to show mother using, manufacturing, or distributing drugs in her home and one that showed the children in the same area at a different time. She asserted that the video recordings were not original and that it would be unfair to admit the duplicate copies because they appeared to have been altered based on some having time stamps that did not accurately reflect the length of the recordings and others having obvious scene jumps or skips. Mother also argued that the video recordings had been anonymously provided and could not be authenticated.

¶ 54 At the start of the jury trial, mother renewed her objection. She reiterated that the Department would not be able to authenticate the video recordings and there were issues with the contents of the recordings. The juvenile court deferred ruling on

the admissibility of the recordings until they were offered into evidence.

¶ 55 Evidence presented at the trial established that the Department received the video recordings of mother and the children through two separate mechanisms. First, an intake caseworker testified that he had received an interoffice envelope that contained a DVD with four video clips. The intake caseworker explained that he did not know who had left the DVD for him.

¶ 56 Second, M.V.'s paternal uncle testified that he had received three video files from an anonymous sender via email. He then sent the video recordings, also via email, to a different intake caseworker at the Department. The second intake caseworker testified that after receiving the email, she downloaded the video recordings onto a disc and deleted the email.

¶ 57 Several witnesses testified that they recognized persons or furniture in the video recordings. For example, the initial intake caseworker recognized mother in the clips on the DVD. Likewise, the paternal uncle testified that he was able to recognize mother in two of the recordings as well as the computer room and an adjacent pool table and light in mother's home.

24

¶ 58    The second caseworker also recognized mother in two of the video recordings as well as three of the children in another recording. The second caseworker further testified that she showed one of the video recordings to mother, who agreed that the recording showed her desk and the children at their then-current ages.

¶ 59    Based on this record, and over mother's objection, the juvenile court admitted six of the video recordings. A police officer subsequently testified that the video recordings appeared to show methamphetamine use and the selling of a substance that appeared to be methamphetamine.

¶ 60    Still, the record is devoid of any testimony from a witness who could independently verify the accuracy of the scenes depicted in the video recordings — mother using and distributing methamphetamine and the children later having access to the same area. In fact, the paternal uncle admitted that he had never witnessed mother using or selling drugs.

¶ 61    In short, the record does not establish that the police officer, the caseworkers, or the paternal uncle was present when the scenes depicted in the video recordings occurred. Thus, they could not

vouch for the accuracy of the recorded scene. *See Baca,* ¶ 31 (concluding that a witness could not vouch for the accuracy of a recorded conversation since he did not hear the conversation as it occurred).

¶ 62 Nor could any witness verify the reliability of the recording process. Indeed, the paternal uncle acknowledged that he had no idea how or when the video recordings were made. Likewise, the second intake caseworker acknowledged that she could not verify the accuracy of the time stamp seen in some of the recordings; when the recordings were created; or whether any of the recordings were altered, modified, or edited. The caseworker further agreed that the video recordings "bounce[d]" and persons in the recordings would suddenly jump from one position to another.

¶ 63 Given that the Department was unable to establish either the accuracy of the scenes depicted in the video recordings or the accuracy of the recording process, the juvenile court erred in admitting the video recordings of mother and the children.

¶ 64 Relying on CRE 1002 and 1003, mother also argues that it was unfair for the juvenile court to admit the video recordings when she was unable to cross-examine the person who made the

26

recording or view the original recordings. Because we have already determined that the juvenile court erred in admitting the recordings without proper authentication, we need not decide this issue.

¶ 65     But this conclusion does not end our analysis. We must also determine whether the admission of the video recordings requires reversal of the jury's verdict.

## C. The Effect of the Admission of the Recordings

¶ 66     Generally, an error in the admission of evidence in a civil case is harmless if it does not affect a substantial right of a party. C.R.C.P. 61; *People in Interest of D.B.*, 2017 COA 139, ¶ 31. An error affects a substantial right if it can be said with fair assurance that it substantially influenced the outcome of the case or impaired the basic fairness of the trial itself. *D.B.*, ¶ 31; *see also Bly v. Story*, 241 P.3d 529, 535 (Colo. 2010). This formulation closely tracks error requiring reversal in the criminal context for non-constitutional error. *See James v. People*, 2018 CO 72, ¶ 19.

¶ 67     The proper inquiry in determining a harmless error question is not, then, whether there was sufficient evidence to support the verdict without the improperly admitted evidence, but, rather, whether the error substantially influenced the verdict or affected

the fairness of the trial proceedings. *Yusem v. People*, 210 P.3d 458, 469 (Colo. 2009). This assessment requires consideration of the importance of the evidence to the proponent's case, whether the evidence was cumulative, the presence of other evidence corroborating or contradicting the point for which the evidence was offered, and the overall strength of the proponent's case. *People v. Casias*, 2012 COA 117, ¶ 64; *see also People v. Bus. or Businesses Located at 2896 W. 64th Ave., Unincorporated Adams Cty.*, 937 P.2d 873, 876-77 (Colo. App. 1996) (recognizing that the erroneous admission of evidence may be harmless when there is ample or conclusive evidence from other sources that establish the same facts). But, the single most important factor is whether the case was close. *Casias*, ¶ 69; *see also People in Interest of G.E.S.*, 2016 COA 183, ¶ 34 (concluding that the erroneous admission of the polygraph evidence was not harmless given the inherently prejudicial nature of the evidence and the lack of otherwise admissible evidence overwhelmingly proving the allegations of dependency and neglect).

### 1. *Basis for Adjudication*

¶ 68    The purpose of an adjudicatory trial is to determine whether the factual allegations in the dependency and neglect petition are supported by a preponderance of the evidence, and, thus, whether the status of the child warrants intrusive protective or corrective state intervention in the familial relationship. § 19-3-505(1); *S.G.L.*, 214 P.3d at 583.

¶ 69    A child is dependent and neglected when the parent has subjected the child to mistreatment or abuse or allowed another to mistreat or abuse the child without taking lawful means to stop the mistreatment or abuse and prevent it from recurring. § 19-3-102(1)(a), C.R.S. 2018. As pertinent here, "abuse" includes an act or omission that threatens the child's health or welfare in any case in which a child is in need of services because the parent fails to take action to provide the supervision that a prudent parent would. § 19-1-103(1)(a)(III), C.R.S. 2018.

¶ 70    A child may also be adjudicated dependent and neglected if the child lacks proper parental care through the parent's actions or omissions or the child's environment is injurious to his or her welfare. § 19-3-102(1)(b)-(c). An injurious environment exists when

a child is in a situation that is likely harmful to the child. *People in Interest of J.G.*, 2016 CO 39, ¶ 26. And it does not require proof of parental fault. *Id.* at ¶ 32; *see also People in Interest of M.M.*, 2017 COA 144, ¶ 21.

## 2. Harmless Error Analysis

¶ 71    To be sure, the video recordings were not the sole evidence presented at the trial to support the Department's assertion that the children were dependent and neglected. The Department also asserted that the children's welfare was at risk because of the chaotic environment and domestic violence that was occurring in the home that mother shared with M.V.'s father (father). Still, we cannot conclude that the admission of the video recordings did not substantially influence the jury's verdict.

¶ 72    First, the record reveals that considerable emphasis was placed on the video recordings. In addition to playing the six recordings for the jury, the Department elicited expert testimony from a police officer to establish that five of the recordings appeared to show methamphetamine use and distribution. The Department also had three separate witnesses — the initial intake worker, the

paternal uncle, and a second caseworker — identify mother in the recordings.

¶ 73    Indeed, the second intake caseworker opined that by the end of July 2017, she was concerned by the video recordings but was not immediately concerned by domestic violence (as opposed to mother re-engaging in a violent relationship) because father had left the home and a protection order was in place.

¶ 74    The record further reveals that the video recordings and their significance were discussed at length during closing argument by both the Department and the children's guardian ad litem.  And the Department again referenced the recordings in its rebuttal argument.

¶ 75    Second, the video recordings are not cumulative of or corroborated by other evidence.  Some, but not all, of the recordings have time stamps showing that they were made in late June 2017. In other words, they purport to show recent methamphetamine use and distribution by mother.  While mother admitted to using methamphetamine in the past (she estimated twenty times) and was on probation for drug possession, there was no other evidence

showing that she used or distributed drugs during the summer of 2017.

¶ 76     Rather, a police officer testified that in April 2016 — approximately seventeen months before the trial — he searched mother's car during a traffic stop and found a shard of methamphetamine on the driver's seat as well as a cosmetic mirror that contained methamphetamine mixed with water in the center console.  Although mother denied that the methamphetamine belonged to her, she admitted that it had been found in her car and resulted in her receiving a felony drug conviction and probation sentence.

¶ 77     Third, the record contains other evidence that tends to contradict that mother had recently used or distributed methamphetamine.  The initial intake caseworker acknowledged that he had not seen any sign that mother was under the influence of methamphetamine or other drugs when he met with her.  The paternal uncle testified that he had not seen mother use or sell drugs.

¶ 78     The record further reveals that before the case was filed, mother provided a urinalysis.  Although she did not take the test at

a facility approved by the Department, the test was negative. Mother also provided a second negative urinalysis on the day the petition was filed.

¶ 79    Additionally, mother's probation officer testified that she had provided four urinalyses since mid-April 2017, which all tested negative, and had completed a substance abuse evaluation that showed she did not need treatment. Finally, mother testified that the last time that she used methamphetamine occurred before she learned that she was pregnant with M.V.

¶ 80    Fourth, without the video recordings, the record shows a much closer case as to whether the children were dependent and neglected. While mother acknowledged past methamphetamine use, it occurred more than a year before the adjudicatory trial, and, as previously discussed, there was evidence that tended to show that the use was not continuing.

¶ 81    True, the record also shows that mother and father had a contentious relationship and police officers had responded to the home on multiple occasions. However, in the end, the officers determined that these were disputes between adults that required no further action. For example, a police officer testified that he

responded to mother's home in January 2017 and observed mother barricaded in a bedroom with M.V., then a newborn, and a twelve- or thirteen-year-old child. Mother told the officer that father's ex-girlfriend had come over and challenged her to a physical confrontation. The officer determined that the incident, as described by mother, did not constitute a crime. And, when no party was willing to take his suggestion to leave the home for the night, he left.

¶ 82 Another police officer testified that he responded to mother's home in June 2017 as a result of a domestic disturbance call from father. Father told the officer that mother had cut off the power to the basement and mother indicated that father "yells at her and locks her out of the house." But, the officer concluded that there was no evidence of domestic violence and described the incident as a "verbal argument between male and female."

¶ 83 The next day, a different police officer responded to mother's home based on a call from father. The officer testified that it appeared that father and mother were having a verbal argument "where nothing illegal was going on."

¶ 84    Additionally, it was undisputed that there was a violent episode of domestic violence between mother and father as well as a heated exchange of M.V. in early July 2017.  On that day, M.V.'s paternal aunt and uncle witnessed a verbal altercation between mother and father.  The aunt described mother and father as "screaming back and forth at each other" while father was in the garage holding M.V. in his arms and mother was parked halfway in the garage.  Father had a bleeding gash on his face and mother had a torn shirt and blood under her arm.

¶ 85    At some point, the aunt took M.V. inside of mother's home and mother left.  About an hour later, mother returned to the home with Mo.M. and asked to take M.V.  The aunt explained that she tried to hand M.V. to mother, but the aunt's son grabbed M.V. and then either mother or Mo.M. grabbed M.V. from the aunt's son.  The aunt also testified that after grabbing the baby, mother said "somebody is going to die tonight, somebody is going to get shot."

¶ 86    After the incident, a police officer met with mother at the hospital.  Mother told the officer that the night before and throughout that morning, she and father had been arguing and, while M.V. was present, father "had put his hands around her

throat and strangled her." The officer observed that mother had scratches on her face, marks around her neck, and a "good size" laceration on the back of her arm.

¶ 87 Despite the serious nature of this incident, mother explained that this was the first incident of physical violence between her and father and the first time that she had been the victim of domestic violence. She also testified that she had not threatened anyone that evening and that she was no longer living with father. Furthermore, the police officer determined that mother was the victim and had a warrant issued for father for domestic violence and child abuse.

¶ 88 It may well be that, in the absence of the video recordings, this other evidence — mother's past methamphetamine use, the contentious relationship resulting in police calls, and the single incident of domestic violence — would have been sufficient to support the jury's verdict that mother had subjected the children to mistreatment or abuse, the children lacked proper parental care as a result of mother's acts or failures to act, and the children's environment was injurious to their welfare. But, this is not the question that we must decide. *See Yusem,* 210 P.3d at 469.

¶ 89     Rather, we conclude that the erroneous admission of the video recordings substantially influenced the jury's verdict given the emphasis placed on the recordings, the lack of cumulative or corroborative evidence, the evidence that tended to contradict mother's recent use, and the closeness of the case (without the recordings).  Accordingly, the error was not harmless, and we must reverse the adjudicatory order.

*IV.  Conclusion*

¶ 90     The adjudicatory and dispositional orders are reversed.  The case is remanded to the juvenile court to hold a new adjudicatory trial.  The court must also ensure, if it has not already done so, that notice of the proceeding is given to the federally recognized Sioux and Apache tribes as well as the BIA before the dispositional hearing.

¶ 91     Additionally, if the children are again adjudicated dependent and neglected, the juvenile court must treat the children as Indian children unless and until it determines that they are not.  Accordingly, if at the time of the dispositional hearing, the court has been unable to determine that the children are not Indian children,

it must comply with 25 U.S.C. § 1912(d) and (e) for any of the children that remain out of a parent's care and determine whether

- the Department has made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the family and these efforts have proved unsuccessful; and

- clear and convincing evidence, including testimony of qualified expert witnesses, demonstrates that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child.

JUDGE LICHTENSTEIN and JUDGE ASHBY concur.