25CA0475 Peo in Interest of CT 12-24-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0475
El Paso County District Court No. 21JV540
Honorable Robin Chittum, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of C.T., Child-Appellant,

and Concerning M.N.S.,

Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE SULLIVAN
Welling and Gomez, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 24, 2025

---

Kenneth R. Hodges, County Attorney, Melanie E. Gavisk, Assistant County Attorney, Adrianne A. Brambila, Assistant County Attorney, Colorado Springs, Colorado, for Appellee

Josie L. Burt, Guardian Ad Litem

Robin Tieman, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant M.N.S.

¶ 1     In this dependency or neglect proceeding, M.N.S. (mother) and the guardian ad litem (GAL) for C.T. (the child) appeal the judgment terminating mother's legal relationship with the child.  We reverse and remand for further proceedings.

## I.     Background

¶ 2     In early 2021, C.J.T. (father) and the child relocated from New Mexico to Colorado without mother's consent.  Mother was subsequently incarcerated for ten months in Texas for a federal drug offense.

¶ 3     In August 2021, after receiving reports that the then-three-year-old child and father were living in hazardous conditions, the El Paso County Department of Human Services (the Department) filed a petition in dependency or neglect citing concerns of neglect and substance abuse by father.  The petition identified mother as "N.T." and described her relationship with the child as unknown.[1] The court adjudicated the child dependent and neglected based on

---

[1] The record is unclear whether N.T. was a nickname or alias for mother, the identification of a separate individual, or simply a misnomer.

father's admission and "N.T.'s" nonappearance. Father passed away a short time later.

¶ 4     Nearly ten months after the Department filed the petition, mother's prison case manager in Texas reached out to the Department seeking information about the child. The Department amended the petition to reflect mother's correct legal name and mother entered a no-fault admission. The juvenile court then adjudicated the child dependent or neglected and adopted a treatment plan for mother. Mother's treatment plan required her to (1) engage in consistent visitation with the child; (2) cooperate with the Department; (3) maintain a safe and stable environment; (4) complete a substance abuse evaluation and follow all recommendations; (5) address any mental health issues; (6) avoid new criminal convictions and address any pending criminal charges; and (7) work with a family therapist and complete a parenting class.

¶ 5     Five months later, the Department moved to terminate mother's parental rights. Following a six-day evidentiary hearing spanning seven months, the juvenile court granted the

Department's motion and terminated mother's legal relationship with the child.

## II. Subject Matter Jurisdiction

¶ 6 As a preliminary matter, we address whether the juvenile court had subject matter jurisdiction under the Uniform Child-custody Jurisdiction and Enforcement Act (UCCJEA), §§ 14-13-101 to -403, C.R.S. 2025, and, as a result, whether it had authority to terminate mother's legal relationship with the child. *See People in Interest of M.S.*, 2017 COA 60, ¶ 12 (concluding that the UCCJEA applies to dependency or neglect proceedings).

¶ 7 Upon review of the record, we asked the parties to file supplemental briefs addressing whether "the juvenile court had jurisdiction to terminate mother's parental rights under the UCCJEA in light of mother's testimony that she had previously filed a child custody case in New Mexico." The Department asserts that the juvenile court had jurisdiction while mother and the GAL dispute jurisdiction.

¶ 8 We review de novo whether the juvenile court had subject matter jurisdiction under the UCCJEA. *Id.* at ¶ 14. "The primary aim of the UCCJEA is to prevent competing and conflicting custody

orders by courts in different jurisdictions" and "to avoid jurisdictional competition over child-custody matters in an increasingly mobile society." *People in Interest of M.M.V.*, 2020 COA 94, ¶ 17. "To effectuate this purpose, [the UCCJEA] establishes a comprehensive framework that a Colorado court must follow to determine whether it may exercise jurisdiction in a child-custody matter or whether it must defer to a court of another state." *Id.*

¶ 9 Under the UCCJEA, a court has jurisdiction to make an initial child-custody determination if, as relevant here, the state is the home state of the child on the date of the commencement of the proceeding. § 14-13-201(1)(a), C.R.S. 2025. "Home state" is defined as the state in which the child lived with a parent for at least 182 consecutive days immediately before the commencement of the proceeding. § 14-13-102(7)(a), C.R.S. 2025.

¶ 10 The court that makes an initial child-custody determination generally retains exclusive, continuing jurisdiction. § 14-13-202(1), C.R.S. 2025; *M.S.*, ¶ 15. And a court of this state may not modify a child-custody determination made by a court of another state unless it has jurisdiction to make an initial child-custody determination and (1) the court of the issuing state determines it no

longer has exclusive, continuing jurisdiction; or (2) a court of this state determines that the child, the child's parents, and any person acting as a parent don't "presently reside" in the issuing state. § 14-13-203(1), C.R.S. 2025.

¶ 11    During the termination hearing, mother testified that a New Mexico court granted her temporary emergency custody of the child approximately eight months before the Department filed the petition in dependency and neglect.[2] No other information was provided regarding the status of the New Mexico case, and the juvenile court never conferred with any New Mexico court. Following the close of evidence, the juvenile court found that the child was born in New Mexico and had moved to Colorado with father about seven months

---

[2] We aren't persuaded by the Department's contention that mother failed to provide sufficient evidence proving the existence of an out-of-state order. The Department, not mother, bore the burden of establishing the juvenile court's subject matter jurisdiction. *See Brandt v. Brandt*, 2012 CO 3, ¶ 33. And once mother notified the juvenile court of the prior order, the court had statutory procedures available to it to obtain further information about the out-of-state child-custody proceeding. *See People in Interest of C.L.T.*, 2017 COA 119, ¶ 42 (acknowledging that the statute places the burden on trial courts even when parties provide only "skeletal information" suggesting the existence of an out-of-state child-custody proceeding).

before the Department filed the petition. The court then concluded that it had subject matter jurisdiction.

¶ 12    We turn first to whether the New Mexico order constituted a "[c]hild-custody determination" under section 14-13-102(3) and conclude that it didn't. The GAL correctly notes that a temporary order qualifies as a child-custody determination and is sufficient to confer exclusive, continuing jurisdiction on the issuing state. *See* § 14-13-102(3). But the out-of-state order in question wasn't only a temporary order, it was also an ex parte order. Mother testified that father needed to be served for the out-of-state order "to go into effect." And the parties agree that father was never served.

¶ 13    Section 14-13-205(1), C.R.S. 2025, requires that any parent whose parental rights have not been terminated be given notice through service of process "[b]efore a child-custody determination is made." *See also* N.M. Stat. Ann. § 40-10A-205(a) (2025) (containing identical notice requirement under New Mexico's version of the UCCJEA). Moreover, a division of this court has recognized that Colorado courts must recognize and enforce a foreign child-custody order "*if* it was made under factual circumstances that substantially comply with the UCCJEA's jurisdictional standards,"

6

including giving the parents notice and the opportunity to be heard. *People in Interest of A.B-A.*, 2019 COA 125, ¶ 20 (emphasis added) (citing § 14-13-104(2), C.R.S. 2025).

¶ 14   By extension, to confer exclusive, continuing jurisdiction on an issuing state, a child-custody determination must meet the UCCJEA's jurisdictional standards. *Cf.* § 14-13-105, C.R.S. 2025 ("A child-custody determination made by a court of this state that had jurisdiction under this article binds all persons *who have been served in accordance with the laws of this state or notified in accordance with section 14-13-108*[, C.R.S. 2025,] or who have submitted to the jurisdiction of the court, and who have been given an opportunity to be heard." (emphasis added)); § 14-13-205 cmt. ("An order is entitled to interstate enforcement and nonmodification under this Act only if there has been notice and an opportunity to be heard."). Because the New Mexico order was an ex parte order that was never served on father, it didn't meet those requirements and therefore didn't constitute a "child-custody determination" as defined by section 14-13-205(1). As a result, the New Mexico court never acquired exclusive, continuing jurisdiction under the UCCJEA.

¶ 15    We next consider whether the juvenile court had jurisdiction to make an initial child-custody determination under section 14-13-201(1)(a) and conclude that it did.  The juvenile court found that Colorado was the child's home state.  The record supports this finding.  Specifically, father and the child arrived in Colorado seven months (more than 182 days) before the Department filed the petition, and father was employed, renting an apartment, and saving for a down payment on a house.

¶ 16    Even so, the GAL contends that the record compels the opposite conclusion — that father and the child were only in Colorado temporarily — pointing out times when father mentioned his goal of returning to New Mexico.  But this argument effectively asks us to reweigh the evidence and substitute our judgment for that of the juvenile court, which we can't do.  *See People in Interest of S.Z.S.*, 2022 COA 133, ¶ 29.  And because the record supports the juvenile court's home state finding, we won't disturb it.  *See People in Interest of S.A.G.*, 2021 CO 38, ¶ 21.

¶ 17    Accordingly, we conclude that the juvenile court had subject matter jurisdiction to enter the termination judgment.

### III. Termination Criteria and Standard of Review

¶ 18    A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent or neglected; (2) the parent hasn't reasonably complied with an appropriate treatment plan or the plan hasn't been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 19    When, as here, a child is under six years old at the time a petition in dependency or neglect is filed, the juvenile court must consider the statutory expedited permanency planning provisions, which require that the child be placed in a permanent home as expeditiously as possible.  §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025; *see S.Z.S.*, ¶ 25.

¶ 20    Whether a juvenile court properly terminated parental rights presents a mixed question of law and fact because it involves application of the termination statute to evidentiary facts.  *People in Interest of L.M.*, 2018 COA 57M, ¶ 17.  We review the court's factual findings for clear error, *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10, and won't disturb them unless the record doesn't support

them.  *People in Interest of J.G.*, 2021 COA 47, ¶ 17.  We review the juvenile court's legal conclusions, including its ultimate determination of whether the Department satisfied its reasonable efforts obligation, de novo.  *See S.R.N.J-S.*, ¶ 10; *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.  The credibility of the witnesses; sufficiency, probative value, and weight of the evidence; and the inferences and conclusions drawn from the evidence are within the juvenile court's discretion.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.

## IV.  Reasonable Efforts

¶ 21    The GAL and mother assert that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate mother and reunify the family.  Specifically, they contend that the Department failed to make reasonable efforts to (1) locate mother and engage her in the case; (2) provide adequate case management, including the timely provision of referrals and services; and (3) provide adequate family time.  We agree.

### A.  Applicable Law

¶ 22    "One of the goals of the Children's Code is to preserve the parent-child relationship whenever possible."  *People in Interest of*

*A.A.*, 2020 COA 154, ¶ 5. To that end, before a juvenile court may terminate parental rights under section 19-3-604(1)(c), a department must make reasonable efforts to rehabilitate the parent and reunify the family. *See* §§ 19-3-100.5(1), 19-3-604(2)(h), C.R.S. 2025; *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). As relevant here, "reasonable efforts" means the "exercise of diligence and care" for children who are in out-of-home placement. § 19-1-103(114), C.R.S. 2025.

¶ 23    Services provided in accordance with section 19-3-208, C.R.S. 2025, are generally deemed sufficient to meet the reasonable efforts standard. § 19-1-103(114). Under that statute, services that "must be available and provided" as determined by individual case planning include, among others, screenings, assessments, home-based family and crisis counseling, information and referral services to assistance resources, family time services, and placement services. § 19-3-208(2)(b). Additional services may be required if funding is available, including transportation, childcare, diagnostic and mental health services, drug and alcohol treatment services, and family support services. § 19-3-208(2)(d).

¶ 24    In assessing a department's efforts, the juvenile court should consider whether the services provided were sufficient to support the parent's treatment plan, *S.N-V.*, 300 P.3d at 915, by "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan," *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.  After a treatment plan is adopted, a department "is obligated to provide the services envisioned in the plan."  *S.Z.S.*, ¶ 37.

¶ 25    A department must provide family time services for parents and children when such services are determined to be necessary and appropriate by individual case plans.  § 19-3-208(1), (2)(b)(IV); *People in Interest of B.C.*, 122 P.3d 1067, 1070 (Colo. App. 2005).  In determining whether and what family time services are necessary and appropriate, the health and safety of the child is paramount. *See B.C.*, 122 P.3d at 1070.  Services, including family time services, should further the purposes of the Children's Code, including the preservation of familial ties whenever possible. § 19-1-102(1)(b).

## B.    Additional Background

¶ 26    After receiving the referral, the Department spoke to father, who identified mother as "N.T."  Six days after filing the petition, the Department ran a search for the name "N.T." and discovered a possible out-of-state address but no "recent [i]nformation."[3]  The Department mailed notifications and a summons to that address. But no responses were received, and the summons was returned as "non-deliverable."  The Department also ran an out-of-state "inmate locator" search for "N.T." about two months into the case.  A month later, the Department requested authorization to serve "N.T." by publication.  In support, the Department asserted that it had exercised due diligence to locate N.T., citing the search it completed three months prior.

¶ 27    After the Department's search efforts, father's counsel notified the Department that his paralegal had found out-of-state criminal cases pending for mother.  And at one point father "gave [the caseworker] a different name" — other than "N.T." — for mother.

---

[3] To complete the search, the Department searched several websites for the name "N.T.," including the Colorado Department of Corrections, Colorado state courts, the county assessor, a social media site, the Federal Bureau of Prisons, and a search engine.

¶ 28    Mother was incarcerated in Texas shortly after the Department filed the petition. Several months later, mother received a letter from paternal grandmother, who claimed to have custody of the child. After mother continued to ask questions and request contact with the child, paternal grandmother admitted that the Department had custody of the child. Mother and her prison case manager began researching, writing letters, conducting online searches, and making phone calls to try to find the child.

¶ 29    Almost ten months after the Department filed the petition, the caseworker received a message that a prison case manager had reached out on mother's behalf, seeking information about the child. The caseworker attempted to contact the prison case manager three times over the course of three months and also sent mother a letter. In early September 2022, one year after the case began, the caseworker spoke to mother for the first time.

¶ 30    Mother appeared at the permanency planning hearing eight days later and requested video visits with the child. The juvenile court ordered that the Department, "with GAL approval, ha[d] discretion to set up visitation for [m]other." The Department decided mother's initial contact with the child should occur through

14

reintegration therapy, but the therapy didn't begin until four months later. At that time, the juvenile court granted mother two therapeutic visits per week. But her second weekly visit didn't begin for another five or six months.

¶ 31 Two years after the case began, mother moved to Colorado and transitioned to supervised in-person family time. In-person family time started at one hour per week for the first two weeks and then increased to two hours per week. Four months later, mother's in-person family time increased to four hours per week, where it stayed for the remainder of the case.

## C. Analysis

¶ 32 The juvenile court concluded that the Department made reasonable efforts, including (1) attempting to locate mother; (2) arranging family time for mother; and (3) providing numerous referrals for services.

¶ 33 Our review of the record leads us to conclude that several of the court's findings lack record support. *See J.G.*, ¶ 17. And even accepting the court's findings that do enjoy record support, we agree with the GAL and mother that the court erred in its legal

15

determination that the Department made reasonable efforts to rehabilitate mother and reunify her with the child. *See A.S.L.*, ¶ 8.

### 1. Efforts to Locate Mother

¶ 34 As detailed above, the caseworker ran two searches for "N.T." early in the case. But the Department didn't conduct additional searches or engage in other efforts to locate mother once father and his counsel provided a different name for mother and information about her pending out-of-state criminal cases.

¶ 35 Even so, the Department on appeal contends that it took "all of the necessary steps to locate [m]other," pointing to the search it conducted for "N.T." one week after it filed the petition. We recognize that the Department's initial efforts to locate mother were hindered because it had an incorrect name. But the Department doesn't explain why it undertook no additional efforts to locate mother once it received new information from father and his counsel. Ultimately, it was mother's own efforts that led her to the Department and commenced her involvement in the case.

### 2. Case Management

¶ 36 The juvenile court found that the caseworker "stayed in good contact with [mother's] treatment providers," attempted visits to

observe family time, and set up a referral for "co-parenting." But the record reflects that, outside of staffing meetings, the caseworker spoke to mother's mental health provider only once in over five months despite expressing concerns about the length and modalities of mother's treatment. Moreover, the caseworker observed just three visits between mother and the child, totaling less than two hours of observation time, in her nineteen months on the case.

¶ 37 The record also reveals that the Department didn't submit a timely referral for mother's co-parenting therapy with the foster family despite the reintegration therapist's recommendation. The reintegration therapist testified that co-parenting therapy between mother and the foster family was important for the child. She noted that, while she observed "positive qualities" of attachment between mother and the child, "co-parenting concerns" and the potential for the child to experience a distressing "loyalty bind" hindered progress. According to the therapist, "the child [was] being put in the middle." For example, both the reintegration therapist and the family time supervisor observed the child commenting that he couldn't do certain things, such as go on trips, jump on the

trampoline, or have a sleepover with the foster grandparents, until he was adopted. The reunification therapist also heard the child tell mother that he couldn't eat the snacks she brought because his foster mother had told him that mother was "poisoning" him. Similarly, during two different visits the family time supervisor overheard the child tell mother that his foster mother had told him he "should say [he] [didn't] want to see [mother]." The reintegration therapist opined that the child needed "stability within the co-parenting unit" to progress in the reunification process.

¶ 38 Given these concerns, the reintegration therapist discussed the need for co-parenting therapy with the caseworker. But the caseworker didn't submit the referral until four months later — just one week before the juvenile court terminated mother's parental rights. The caseworker justified this delay by explaining that she thought the reintegration therapist would provide the service and that she wasn't aware that a referral needed to be submitted. But the caseworker acknowledged that she had been present when the reintegration therapist testified, over two months prior, that the therapist couldn't provide co-parenting therapy and that a referral needed to be submitted.

¶ 39    Due to the Department's delay, co-parenting therapy didn't commence before the juvenile court terminated mother's parental rights. *See* § 19-3-208(2)(a) ("'Services' shall be designed to . . . [p]romote the *immediate* health, safety, and well-being of children eligible for these services . . . [and] [f]acilitate, if appropriate, the *speedy* reunification of parents with any of their children who have been placed in out-of-home placement . . . ." (emphasis added)).

¶ 40    The Department, without citing any record support, asserts that it "consistently . . . maintain[ed] contact with [m]other's providers" and that "[i]f reasonable efforts had not been made, [m]other would not be in all of the services that she was in." True, the Department made referrals for mother's substance abuse and mental health treatment. But based on our review of the Department's comprehensive case management efforts, we agree with the GAL and mother that the juvenile court erred by concluding that the Department made reasonable efforts. *See* *My.K.M.*, ¶ 33.

19

### 3.    Family Time

¶ 41    Last, in support of its conclusion that the Department made reasonable efforts, the juvenile court found that the Department arranged virtual family time while mother resided out-of-state and then in-person family time once mother moved to Colorado.  While we agree that the record supports this finding, the court's order doesn't account for the Department's (1) delay in starting reintegration therapy; (2) delay in providing family time as ordered; and (3) refusal to expand mother's family time as recommended.

¶ 42    During mother's first appearance, the juvenile court improperly ordered that the Department would have "discretion to set up visitation for [m]other."  *See B.C.*, 122 P.3d at 1070 ("[D]ecisions concerning visitation may not be unconditionally delegated to third persons . . . .").  The court didn't enter any other family time orders at that time, including orders governing the frequency or duration of family time visits.  Due to a delay in the Department's submission and implementation of the referral for reintegration therapy, the child's first visit with mother didn't occur until four months later.  The caseworker admitted that this delay wasn't reasonable.  And mother's expert expressed concern that

this delay could have impeded progress toward reunification of the family.

¶ 43     Recall that once reintegration therapy began, the juvenile court ordered that mother have two therapeutic visits per week. At the permanency planning hearing six weeks later, the GAL expressed concern that mother was still receiving only one visit per week. In response, the court ordered the second visit to commence within two weeks. But over three months later, mother still hadn't received the second weekly visit as ordered. The caseworker explained that she had submitted a new referral allowing up to three visits per week, but she said that the foster mother was "having a little bit of difficulty getting it to fit into her schedule." Mother's second weekly visit with the child didn't begin until five or six months after the court initially ordered it.

¶ 44     In September 2023, about three months later, mother moved to Colorado and began exercising in-person family time once per week, increasing to twice per week five months later. Despite continued positive reports and recommendations for increased family time from the reintegration therapist and family time supervisor, mother's family time remained at four hours per week

for the last year of the case. The reintegration therapist testified that, typically, the reunification process is "experience based" and needs to "continue to build." But here, "hindrances and roadblocks" from the Department, including a lack of communication and hesitancy to follow the therapist's recommendations based on reported statements from the child, delayed progress. The reintegration therapist explained that it would be "atypical" for a parent to have supervised family time for as long as mother unless "major" safety concerns existed. And neither she nor the family time supervisor had any concerns with mother or her interactions with the child. The reintegration therapist opined that, if not for the Department's roadblocks — such as its lack of communication and hesitancy to implement recommended family time expansion — the case would have been "at a different stage."

¶ 45    On appeal, the Department doesn't address the concerns raised by the GAL and mother regarding family time. To the extent the Department argues that its other efforts — including referrals for treatment, financial assistance, and consistent communication — sufficiently supported the juvenile court's

22

reasonable efforts determination, regardless of the delays in family time, we disagree.

¶ 46    Family time is a required service, if deemed appropriate by an individual case plan, for parents of children in out-of-home placement.  § 19-3-208(2)(b)(IV).  In this case, mother's first treatment plan objective required that she "have consistent visitation with [the] child in order to maintain and strengthen their bond."  But, as discussed above, the Department didn't provide family time as ordered until almost a year after mother's prison case manager first reached out on mother's behalf.  The provision of family time services uniquely impacts the ability of parents and children to successfully reunify.  *See* § 19-1-103(64.5) (defining "[f]amily time" as "any form of contact or engagement between parents . . . and children or youth for the purposes of preserving and strengthening family ties"); § 19-3-208(2)(a) (family time shall be designed to facilitate the "speedy reunification" of parents and children).  The Department's failure to provide adequate family time services throughout this case substantially restricted mother's statutory right to family time and reunification with the child.

23

## 4.    Conclusion

¶ 47    Based on the foregoing, we conclude that the juvenile court erred by finding that the Department made reasonable efforts to reunify mother and the child.

¶ 48    We also conclude that the error wasn't harmless.  *See People in Interest of M.V.*, 2018 COA 163, ¶ 66 (explaining that an error isn't harmless if "it can be said with fair assurance that [the error] substantially influenced the outcome of the case or impaired the basic fairness of the trial itself"), *overruled on other grounds by*, *People in Interest of E.A.M. v. D.R.M.*, 2022 CO 42.  The court's termination order focused, in part, on the lack of a "secure" attachment between mother and the child as well as the lack of progress during the last year and a half of the case.  But mother's ability to rebuild an attachment with the child was delayed by nearly two years — first, by the Department's lack of effort to locate her and, second, by the Department's delay in setting up family time as ordered.  In addition, the case stagnated, at least in part, due to the Department's delay in (1) approving recommended expansions of, and increases to, mother's family time and (2) submitting the recommended referral for co-parenting therapy.

Under these circumstances, we can't say that the Department's lack of reasonable efforts was harmless.

¶ 49    Accordingly, based on the Department's lack of reasonable efforts, we reverse the juvenile court's order terminating mother's legal relationship with the child and remand the case for further proceedings.

## V.    Other Contentions

¶ 50    Because we have concluded that the juvenile court erred with respect to its reasonable efforts determination, we need not address the other contentions raised by mother and the GAL.

## VI.    Indian Child Welfare Act

¶ 51    While not raised as an issue on appeal, our review of the record reveals that the juvenile court didn't comply with the provisions of the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963, because it didn't ask mother on the record whether she had reason to know that the child was an Indian child at either the dispositional or termination hearing.  *See* § 19-1.2-107(2)(a), C.R.S. 2025 (requiring the juvenile court to ask the parties on the record whether they know or have reason to know that the child is an Indian child at any emergency, voluntary, or involuntary child-

25

custody proceeding); *M.V.*, ¶ 42 (identifying the dispositional hearing as a child-custody proceeding under ICWA); *see also People in Interest of C.A.*, 2017 COA 135, ¶ 2 (holding that even if the juvenile court conducted an ICWA inquiry at an initial temporary custody hearing, it must still make another inquiry when termination is sought).

¶ 52    Because we are remanding for further proceedings, the juvenile court on remand should conduct the proper ICWA inquiry and make findings as to whether ICWA applies before entering any future judgment.

## VII.   Disposition

¶ 53    We reverse the termination judgment and remand the case to the juvenile court for further proceedings consistent with this opinion.

JUDGE WELLING and JUDGE GOMEZ concur.