The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
July 7, 2022

**2022COA72**

**No. 21CA1768, *People in Interest of M.W.* — Juvenile Court —
Dependency and Neglect — Adjudication — Disposition —
Treatment Plan — SOMB Evaluation**

As a matter of first impression, a division of the court of
appeals concludes that a juvenile court in a dependency and
neglect case may not require a parent to complete an SOMB
evaluation and treatment if the parent objects and has not been
convicted of a sex offense.  The division also concludes that a
parent may appeal the content of an initial dispositional order
contemporaneously with the appeal of an order adjudicating the
child dependent or neglected.

COLORADO COURT OF APPEALS                                    **2022COA72**

Court of Appeals No. 21CA1768
Mesa County District Court No. 21JV59
Honorable Valerie J. Robison, Judge

The People of the State of Colorado,

Appellee,

In the Interest of M.W., a Child,

and Concerning D.W.,

Appellant.

JUDGMENT AFFIRMED IN PART, VACATED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE SCHUTZ
J. Jones and Welling, JJ., concur

Announced July 7, 2022

Todd M. Starr, County Attorney, Brian Conklin, Assistant County Attorney,
Grand Junction, Colorado, for Appellee

Leigh C. Taylor, Guardian Ad Litem

Patrick R. Henson, Office of Respondent Parents' Counsel, Chelsea A. Carr,
Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1     Father, D.W., appeals the adjudication of his child, M.W., as dependent or neglected. Father contends that the juvenile court erred by prohibiting his out-of-state witnesses from testifying at the adjudicatory hearing via Webex and by requiring him to complete a psychosexual evaluation and comply with any resulting treatment recommendations.

¶ 2     We conclude that the juvenile court did not abuse its discretion by prohibiting the remote testimony. We therefore affirm the adjudication of M.W. as dependent or neglected.

¶ 3     With regard to father's challenge of his treatment plan, we must first determine whether a parent may appeal an initial dispositional order in a dependency and neglect proceeding prior to issuance of an order terminating their parental rights. We conclude that an initial dispositional order is a final and appealable order when challenged contemporaneously with an appeal of the adjudication of a child as dependent or neglected.

¶ 4     Addressing the merits of father's challenge of the treatment plan, we hold that the juvenile court erred by requiring father to complete a Sex Offender Management Board (SOMB) evaluation and

1

comply with all resulting recommendations.  Accordingly, we vacate that portion of the treatment plan.

### I. Factual Background and Procedural Setting

¶ 5 The Mesa County Department of Human Services (the Department) initiated a dependency and neglect proceeding based upon allegations that father had sexually assaulted his daughter, M.W., that M.W. lacked proper parental care, and that M.W.'s environment was injurious to her health and welfare.

¶ 6 Father contested the petition, and an adjudicatory hearing was held before a jury.  Father filed a motion requesting that he be permitted to call two witnesses located in Oregon to testify via Webex.  The juvenile court denied the motion.  The jury returned a verdict finding that M.W. was in an injurious environment and lacked proper parental care because of father's actions or failure to act.  Based upon the jury's verdict and M.W.'s mother's prior admission that the child was dependent or neglected, the court entered an order adjudicating M.W. dependent or neglected as to both parents.

¶ 7 Before the dispositional hearing, the Department filed a proposed treatment plan.  Among other things, the plan required

father to complete a "[p]sychosexual evaluation" to "[a]ssist in determining risk for re-offense and need for sex offender therapy if any." Father's success in meeting this treatment objective was to be evaluated based on whether he "attended all sessions," was "open and honest during the evaluation," completed "all paperwork required by the evaluation," and followed "all recommendations of the completed psychosexual evaluation."

¶ 8 Father filed a written objection to the requirement that he complete a psychosexual evaluation and treatment under standards set by the SOMB. He argued that such a requirement was not reasonably calculated to render him a fit parent and violated his constitutional rights against self-incrimination and to be free from criminal sanctions absent a criminal conviction. After a contested hearing, the juvenile court rejected father's argument and adopted the treatment plan as proposed because of past and ongoing concerns regarding father's inappropriate sexual conduct and the emotional trauma M.W. was suffering because of her relationship with father.

## II.    Webex Testimony

¶ 9    Father contends the juvenile court reversibly erred by excluding remote testimony via Webex from two witnesses located in Oregon.  We disagree.

### A.    Additional Facts

¶ 10    Father advised the juvenile court that he intended to call two witnesses — a relative and a caretaker for M.W. — who knew her while she resided in Oregon.  He expected these witnesses would testify that M.W. neither referenced any prior abuse by her father in Colorado nor made any allegation of abuse while both father and daughter resided in Oregon.  The motion also indicated that these witnesses could testify concerning "family dynamics" but did not specify the nature of such testimony.

¶ 11    The Department opposed the motion, arguing that it was undisputed that M.W. did not begin to articulate the alleged abuse until she returned to Colorado.  The Department also noted that the allegations of sexual abuse were secondary to its case, asserting that whether the specific allegations of sexual abuse were true or not, M.W. had expressed a history of trauma with both of her parents, particularly her father, and no longer wished to live with

4

him.  Thus, the Department argued the witnesses' proffered testimony had marginal, if any, relevance.  The Department also argued that to the extent the witnesses' testimony was deemed relevant, their credibility would be an important consideration for the jury and that the jury's assessment of these witnesses' credibility would be hampered if the court authorized remote testimony.

### B.    Standard of Review

¶ 12    We review a juvenile court's decisions concerning the orderly administration of a trial for an abuse of discretion.  *See Makeen v. Hailey*, 2015 COA 181, ¶ 38 ("[C]ourts have broad discretion to manage trials, and [appellate courts] review these trial management decisions for an abuse of discretion.").  The juvenile court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or if it is based on an erroneous understanding or application of law.  *People in Interest of M.V.*, 2018 COA 163, ¶ 52.

### C.    Application

¶ 13    Father contends the juvenile court should have allowed the remote testimony under the Chief Justice Order and local Chief Judge Order issued to address best practices during the COVID-19

pandemic. The cited orders encourage, but do not mandate, that trial courts authorize remote appearances during the pandemic. For example, the Chief Justice Order provides that "*with the understanding that some judicial proceedings may require personal appearances, wherever reasonably feasible*, judicial proceedings, regardless of their nature, should continue to be conducted remotely." Office of the Chief Justice, Updated Order Regarding COVID-19 and Operation of Colorado State Courts (May 5, 2020) (emphasis added), https://perma.cc/G6VG-XAYD. The Chief Judge Order contained a similar directive.

¶ 14 Contrary to the Department's argument, these orders do not eliminate a juvenile court's authority and obligation to consider the particular circumstances of each case before permitting a witness to testify remotely. C.R.C.P. 43 informs a court's exercise of that discretion. The rule provides various criteria to govern the juvenile court's consideration:

> (A) Whether there is a statutory right to absentee testimony.
>
> (B) The cost savings to the parties of having absentee testimony versus the cost of the witness appearing in person.

(C) The availability of appropriate equipment at the court to permit the presentation of absentee testimony.

(D) The availability of the witness to appear personally in court.

(E) The relative importance of the issue or issues for which the witness is offered to testify.

(F) If credibility of the witness is an issue.

(G) Whether the case is to be tried to the court or to a jury.

(H) Whether the presentation of absentee testimony would inhibit the ability to cross examine the witness.

(I) The efforts of the requesting parties to obtain the presence of the witness.

C.R.C.P. 43(i)(3).

¶ 15    The juvenile court's order focused primarily on factors (C) and (E) through (H). The court observed that the adjudicatory trial was to a jury and that credibility of the witnesses' testimony would be a key issue. The juvenile court found the "lack of outcry testimony" was only marginally relevant. The court also noted that father had failed to demonstrate that the testimony concerning family dynamics was not available from alternative witnesses. Finally, the court said that it had recently attempted to take Webex testimony

7

from remote witnesses and that "there were technology issues and problems with the ability to hear."

¶ 16    While the court did not expressly address the remaining factors, neither party contended there was a statutory right to present remote testimony. And father did not present evidence related to his efforts to procure the personal attendance of the witnesses at trial. Father's counsel did state that the Office of Respondent Parents' Counsel would not pay the "three thousand to four thousand dollars to fly two people in for ten minutes of testimony."

¶ 17    The decision whether to permit remote testimony is left to the sound discretion of our trial courts for good reason. Trial judges are uniquely situated to make the practical assessments envisioned by Rule 43. They know the capabilities and limitations of their audiovisual equipment, they are familiar with the central issues in the case, and they are in a position to evaluate the role credibility will play in assessing the weight of a given witness's testimony. Simply put, trial courts are better positioned than appellate courts to make the discretionary determination whether to permit remote testimony. We will not disturb the exercise of that discretion absent

a clear abuse. No such abuse occurred here; accordingly, we conclude that the court did not err by denying father's motion for remote testimony.

### III. Dispositional Appeals

¶ 18 Father next argues that the juvenile court erred by adopting a treatment plan that requires him to complete an SOMB psychosexual evaluation and comply with all recommendations resulting from the evaluation. Although the parties have not questioned our jurisdiction to address this issue, we discern a degree of uncertainty in our case law regarding this threshold question. Because subject matter jurisdiction is a prerequisite to our authority to hear a case, it may be raised at any time, by any party, or by the court on its own initiative. *People in Interest of E.E.A.*, 854 P.2d 1346, 1350 (Colo. App. 1992).

¶ 19 Generally, we have legal authority to review only final orders or judgments. C.A.R. 1; *see also People in Interest of S.C.*, 2020 COA 95, ¶ 6. Appeals in dependency and neglect cases are governed by section 19-1-109, C.R.S. 2021. We review a question of statutory interpretation de novo. *People in Interest of H.T.*, 2019 COA 72, ¶¶ 12-13.

¶ 20    The Children's Code classifies "[a]n order decreeing a child to be neglected or dependent" — known as an adjudicatory order — as a final appealable order. § 19-1-109(2)(c). An adjudicatory order becomes final for purposes of appeal only "after the entry of the disposition pursuant to section 19-3-508." § 19-1-109(2)(c); *see also* C.A.R 3.4(a).

¶ 21    At the dispositional hearing, unless immediate termination of parental rights is contemplated, the court is ordinarily required to adopt a treatment plan designed to address the issues that gave rise to the filing of the petition. § 19-3-508(1)(e)(I), C.R.S. 2021; *see also* § 19-3-507(1)(a), C.R.S. 2021 ("After making an order of adjudication, the court shall hear evidence on the question of the proper disposition best serving the interests of the child and the public.").

¶ 22    There is no question that an adjudicatory order is final and appealable after the entry of an initial dispositional order. § 19-1-109(2)(c); *see also H.T.*, ¶¶ 22-23. But the question before us is whether the initial dispositional order is also reviewable contemporaneously with the appeal of the adjudicatory order.

10

¶ 23    Prior to the General Assembly's enactment of section 19-1-109(2)(c), a division of this court held that "following an adjudication of dependency and neglect, the initial dispositional order adopting a treatment plan constitutes a 'decree of disposition' and renders *the adjudication and the initial dispositional order final for purposes of appeal.*" *People in the Interest of C.L.S.*, 934 P.2d 851, 854 (Colo. App. 1996) (emphasis added). After *C.L.S.*, the General Assembly amended section 19-1-109 to include the present language providing that an adjudicatory order is appealable after the entry of a dispositional order. *See* Ch. 254, sec. 7, § 19-1-109(2)(c), 1997 Colo. Sess. Laws 1433; *see also H.T.*, ¶ 20 (discussing the statutory change following the decision in *C.L.S.*).

¶ 24    In *H.T.*, a division of this court applied the current version of section 19-1-109(2)(c) and held that "adjudicatory orders are final and appealable but dispositional orders, *by themselves*, are not." *H.T.*, ¶ 22 (emphasis added). In reaching this conclusion, the division in *H.T.* clarified that

> our holding is not in conflict with *C.L.S.* We agree that a party has a right to appeal *both* the adjudicatory order and the initial dispositional order. This is because how the merits are reached on an adjudicatory order

11

> will also affect the merits of the dispositional order.  Our holding simply clarifies that an initial dispositional order, by itself, is not a final, appealable order.

*Id.* at ¶ 26.

¶ 25    We note that the language of section 19-1-109(2)(c) affords an argument that only the adjudicatory order, but not the dispositional order, is appealable: "An order decreeing a child to be neglected or dependent shall be a final and appealable order after the entry of the disposition . . . ."  The statute does not expressly state that both the adjudicatory and initial dispositional orders are appealable.  But the statute also does not expressly state that only the adjudicatory order is appealable.

¶ 26    At the time the current language of section 19-1-109(2)(c) was adopted, there was existing case law from our appellate courts confirming that both an adjudicatory order and an initial dispositional order may simultaneously be appealed after a dispositional order is entered.  *See, e.g., C.L.S.,* 934 P.2d at 854.  We presume the General Assembly was mindful of that precedent when it amended the statute.  *See Vaughan v. McMinn,* 945 P.2d 404, 409 (Colo. 1997) ("The legislature is presumed to be aware of

12

the judicial precedent in an area of law when it legislates in that area.").  And with that knowledge, the General Assembly elected not to eliminate the historical right of a parent to appeal the initial dispositional order along with the adjudicatory order.  Given these circumstances, we will not imply that the General Assembly intended its silence to eliminate an existing right established by our case law.  *See, e.g., People v. Swain*, 959 P.2d 426, 430-31 (Colo. 1998) ("[T]he legislature is presumed, by virtue of its action in amending a previously construed statute without changing the portion that was construed, to have accepted and ratified the prior judicial construction.").

¶ 27    Consistent with these authorities, we hold that a parent may appeal the content of the initial dispositional order, including provisions of the treatment plan, simultaneously with an appeal of an adjudicatory order.

¶ 28    This interpretation of section 19-1-109(2)(c) is consistent with the core goals of the Children's Code.  The Code aims to "preserve and strengthen family ties whenever possible."  § 19-1-102(1)(b), C.R.S. 2021.  In addition, the Code directs courts to achieve permanency on behalf of children under the age of six "as

13

expeditiously as possible." § 19-3-702(5)(c), C.R.S. 2021; § 19-1-123, C.R.S. 2021. To this end, the Code also urges "courts to proceed with all possible speed to a legal determination that will serve the best interests of the child." § 19-1-102(1)(c).

¶ 29 Our case law makes clear that a parent may appeal the requirements of a dispositional order as part of the appeal of a termination order. *See, e.g.*, *People in Interest of L.M.*, 2018 COA 57M, ¶¶ 37-52. The entry of an initial dispositional order follows an adjudication. In contrast, a termination order may not follow until a year or longer after a dependency and neglect case is filed. If a parent successfully challenges a treatment plan requirement after a termination order has been entered, the termination is set aside and the placement and corresponding permanency for the child is frequently undone. But if parents are afforded the opportunity to appeal an initial dispositional order at the same time they appeal an adjudicatory order, any defects in the treatment plan can be addressed early in the case. Such an outcome benefits the parents, but, most importantly, it also serves the ultimate interest of the child in timely achieving permanency. These practical realities provide additional justification for continuing to recognize a parent's

14

right to appeal an initial dispositional order contemporaneously with an adjudicatory order.[1]

¶ 30    Having determined that the initial dispositional order — including the content of father's treatment plan — presents an appealable issue, we now address the merits of his argument.

### IV.    Propriety of the Treatment Plan

¶ 31    Father contends that the juvenile court erred by imposing, over his objection, a criminal requirement — that he submit to a psychosexual evaluation and comply with all resulting recommendations based on guidelines developed by the SOMB — in the absence of him having been convicted of a sex offense. We agree.

### A.    Standard of Review

¶ 32    "The trial court has discretion to formulate a treatment plan reasonably calculated to render the parent fit to provide adequate parenting to the child within a reasonable time that relates to the

---

[1] Several other states allow appeals of dispositional orders in dependency and neglect proceedings. *See Lindsey M. v. Ariz. Dep't of Econ. Sec.*, 127 P.3d 59, 61 (Ariz. Ct. App. 2006); Ark. R. App. P.-Civ. 2(c)(3); *In re Daniel K.*, 71 Cal. Rptr. 2d 764 (Ct. App. 1998).

child's needs." *C.L.S.*, 934 P.2d at 855; *see also* § 19-1-103(12), C.R.S. 2021 (defining an "appropriate treatment plan"). An abuse of discretion occurs when the juvenile court's actions are manifestly arbitrary, unreasonable, or unfair, or based on an erroneous understanding or application of the law. *M.V.*, ¶ 52. We review de novo a question of law, such as the propriety of applying SOMB's standards to a civil proceeding. *People v. Williamson*, 2021 COA 77, ¶ 11.

## B. SOMB Standards

¶ 33 The General Assembly established the SOMB in 1992 to "protect the public and to work toward the elimination of sexual offenses," finding it "necessary to comprehensively evaluate, identify, treat, manage, and monitor adult sex offenders who are *subject to the supervision of the criminal justice system*." § 16-11.7-101(1), C.R.S. 2021 (emphasis added). The SOMB is responsible for establishing "evidence-based standards for the evaluation, identification, treatment, management, and monitoring of adult sex offenders . . . who have committed sexual offenses at each stage of the criminal . . . justice system to prevent offenders from

reoffending and enhance the protection of victims and potential victims." § 16-11.7-101(2).

¶ 34　The term "sex offender" applies only to those defendants who have been convicted of one or more of the offenses enumerated in section 18-1.3-1003(5), C.R.S. 2021. In recent precedent, the supreme court has coined the term "sex-related offenses" to describe those categories of criminal offenses that are not included within the statutorily enumerated offenses labeled as a "sex offense," but that nevertheless are predicated upon conduct involving criminal sexual behavior. *See, e.g.*, *People v. Manaois*, 2021 CO 49, ¶ 46; *People v. Keen*, 2021 CO 50, ¶ 3.

¶ 35　In accordance with its statutory mandate, the SOMB adopted the first Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders in 1996. Over the years, the Standards have been modified and updated to reflect various developments in the treatment of sex offenders as well as legal developments occasioned by legislative amendments and case law interpreting the underlying statutes and resulting regulations. The Standards were most recently updated in April of 2022. Sex Offender Management Board, Standards and

Guidelines for the Assessment, Evaluation, Treatment and

Behavioral Monitoring of Adult Sex Offenders,

https://perma.cc/V4N9-A65Y (SOMB Standards).

¶ 36       The SOMB Standards establish procedures that must be used

by those who are licensed by SOMB when evaluating and treating

sex offenders.  The initial evaluation that a convicted sex offender

must complete is typically referred to as an offense specific

psychosexual evaluation or simply a psychosexual evaluation.

¶ 37       The requirements of SOMB evaluations and resulting

treatment are extraordinary.  The sex offense specific psychosexual

evaluation is intended to identify the most appropriate types of

treatment for the offender and to assess the levels of risk and

specific risk factors that require attention in treatment and

supervision.  SOMB Standards § 2.000.  The evaluation is

performed using various objective and subjective modalities.  Based

on the initial evaluation, a risk assessment and treatment plan are

developed for the sex offender.  Offenders are assigned a

Community Supervision Team (CST), which includes, at a

minimum, the offender's supervising officer, the treatment provider,

the evaluator, the victim representative, and the polygraph

examiner.  The CST professionals collaborate to make decisions about the offender.  *Id.* at Definitions.  The SOMB Standards contemplate that after the initial psychosexual evaluation, the sex offender will be required to complete sex offense specific treatment.

## C.  The Effect of SOMB Standards on an Offender's Right to Remain Silent

¶ 38   The SOMB Standards contemplate that an offender may "refuse to answer incriminating sexual offense history questions." *Id.* § 6.012(F).  In such circumstances, the SOMB Standards provide that, "[w]hile treatment providers shall not unsuccessfully discharge an offender from treatment solely for refusing to answer incriminating questions, a treatment provider may opt to discharge a client from treatment or not accept a client into treatment if the provider determines a factor(s) exists that compromises the therapeutic process." *Id.* § 3.160(B)(3)(a)(i).  Thus, while a sex offender's exercise of the right to remain silent may not serve as the *sole* basis for terminating an offender's therapy, it may be considered as part of the calculus in deciding whether therapy should be discontinued.

D.    SOMB Standards on Offenders' Contact with Children

¶ 39    The Standards severely restrict the contact a sex offender may have with anyone under the age of eighteen, including members of the offender's own family.  As a starting point, the SOMB Standards provide that all sex offenders will have no contact with anyone under the age of eighteen.  The one exception is an implied acknowledgment that an offender may have contact with their own children if a court (or the parole board, as applicable) elects not to prohibit such contact.  *Id.* § 5.720(A) (five pathways exist for potential contact with minor children, one of which occurs when the court or parole board "has not prohibited contact with an offender's own non-victim minor child(ren)").

¶ 40    The SOMB Standards contemplate that an offender may have "incidental contact" with children, but such permissible contact is narrowly defined.  *See id.* § 5.715(C) (defining incidental contact).  In all other circumstances, the guidelines prohibit any "non-incidental" contact with any children unless and until approved by the CST.  *Id.*  In contrast, the SOMB Standards' definition of purposeful contact includes such things as face-to-face interaction, any verbal or non-verbal exchange, and being in the same residence

20

or vehicle as a child. *Id.* § 5.715(G)(1)-(4), (7). These restrictions apply to all sex offenders, and to all non-incidental contact with all children, whether family or not. *See, e.g., id.* § 5.751 (no offender may have any non-incidental contact with their grandchildren unless they meet specific criteria, and even then, such contact must start out as supervised).

¶ 41     Over the years, there has been substantial litigation in Colorado and elsewhere concerning the propriety of using these types of restrictions to manage those who have been convicted of sex offenses. But the issue presented here is not whether these types of restrictions may be imposed to restrict the conduct of a criminal defendant who has been convicted of a sex offense. Rather, we are faced with the question whether these types of restrictions may be included in a treatment plan as a condition to reunification of a parent with their child when the parent has not agreed to the treatment[2] and has not been convicted of a sexual

_____

[2] Because we are not required in this case to resolve the question of whether SOMB assessments and treatment may be included in a treatment plan with the consent of a parent, we express no opinion on that issue.

offense. To answer that question we must consider the legitimate purposes and limitations of a treatment plan.

### E. Purposes and Parameters of a Treatment Plan

¶ 42    Upon an adjudication of a child as dependent or neglected, the juvenile court must fashion a treatment plan designed to "preserve the parent-child legal relationship by assisting the parent in overcoming the problems that required intervention into the family." *People in Interest of K.B.*, 2016 COA 21, ¶ 11. "In determining whether a treatment plan is appropriate, the court must consider whether the plan's objectives adequately address the safety concerns identified during the assessment of the family." *Id.* at ¶ 14. "Thus, the appropriateness of such a plan can only be measured by examining the likelihood of its success in accomplishing this purpose." *People in Interest of B.J.D.*, 626 P.2d 727, 730 (Colo. App. 1981).

¶ 43    Because the purpose of a treatment plan is to address the material issues that are barriers to reunifying children with their parents, it is appropriate for a treatment plan to address those material issues even if the order of adjudication was not necessarily predicated upon the particular problem the treatment plan seeks to

address.  *See, e.g., C.L.S.*, 934 P.2d at 856 ("[T]he specific ground on which the jury [finds] the child to be dependent and neglected [does] not restrict the juvenile court's discretion to formulate a treatment plan in the best interests of the child.").  So, for example, if the parents were experiencing discord in their relationship that was interfering with their ability to appropriately parent their children, the court could order them to complete couples' therapy even if their discord did not form the factual basis of the adjudicatory order.

¶ 44    On the other hand, our case law also makes clear that dependency and neglect proceedings are not criminal in nature and are not intended to punish parents, as our supreme court crystalized decades ago: "In a hearing to determine if a child is neglected or dependent, there is no fine or confinement to a state institution nor any other criminal sanctions.  These are not criminal proceedings."  *Robinson v. People in Interest of Zollinger*, 173 Colo. 113, 118, 476 P.2d 262, 265 (1970); *see also People in Interest of S.N.*, 2014 CO 64, ¶ 9 ("[A]n adjudication is not meant to punish the parents.").

¶ 45     With these concepts in mind, we address father's argument that the court improperly required him to complete a psychosexual evaluation and comply with all resulting recommendations.

### F. The Propriety of Requiring a Parent to Complete a Psychosexual Evaluation and Treatment Absent a Conviction

¶ 46     Although father has not been convicted of a sex offense, serious allegations of sexual impropriety have been made against him over the years, including the allegations made by M.W. and at least one other juvenile. Although these allegations have not resulted in a conviction, the juvenile court found them credible and was understandably troubled by them.

¶ 47     In deciding to require father to complete a sex offender evaluation and comply with the resulting recommendations and treatment, the court said, "I cannot, in this case, particularly, with the evidence that was presented during the trial . . . not consider or somehow decide not to address the main issue, certainly that was discussed in the allegations that [M.W.] has made." Based on these concerns, the court found "that it is appropriate to include a psychosexual evaluation in this case, and it will be ordered." For these same reasons, the court denied father's motion to preclude

24

the court from subjecting him to a psychosexual evaluation and treatment under the SOMB Standards.

¶ 48    In entering these orders, the juvenile court did not address any specific SOMB Standards or the constitutional issues raised by father.  Instead, it broadly authorized a psychosexual evaluation and any recommended treatment using the SOMB Standards.

¶ 49    In *People in Interest of L.M.,* a division of this court addressed whether it was appropriate to require a parent who had been accused of committing a sexual offense, but who had not been criminally convicted, to submit to SOMB treatment.  2018 COA 57M.  The father in *L.M.* was accused of sexually assaulting one of his two children.  *Id.* at ¶ 2.  At an adjudicatory hearing, the juvenile court found by a preponderance of the evidence that the father had committed the sexual assault and therefore adjudicated the children dependent or neglected as to him.  *Id.*  The juvenile court adopted a treatment plan requiring the father to "participate in a psychosexual evaluation . . . and follow any recommended offense-specific treatment."  *Id.* at ¶ 10.

¶ 50    The father was also charged criminally based on the sex assault allegations, but he was acquitted of those charges at trial.

*Id.* at ¶ 3. In a subsequent termination hearing, the juvenile court concluded that it could not find by clear and convincing evidence that the father had assaulted the child. *Id.* at ¶ 33. Nonetheless, the juvenile court entered an order terminating his parental rights, finding that the children continued to experience emotional trauma incident to the allegations and that termination of the father's parental rights was in the children's best interests. *Id.* at ¶ 36.

¶ 51 In assessing the juvenile court's decision to terminate the father's parental rights, the division considered the propriety of requiring him to comply with SOMB Standards as part of his treatment plan. As a starting point, the division emphasized that "a key provision of the SOMB procedures is that they are designed for sex offenders" who have been convicted of a criminal offense. *Id.* at ¶¶ 41-42 (citing § 16-11.7-102(2)(a), C.R.S. 2017). Consistent with the statutory predicate of criminal conviction, the division noted that SOMB evaluations and treatment protocols are built around the premise of guilt.

¶ 52 The division also noted that SOMB treatment protocols create significant dilemmas for parents who wish to exercise their constitutional right to remain silent with respect to matters that

may incriminate them, or who affirmatively deny the allegations of sexual abuse.

> [T]he record is replete with evidence that no progress was made toward reunification because father had not admitted or acknowledged the abuse. And, father was adamant that he was not going to admit molesting or abusing the children . . . .
>
> This component of SOMB treatment — the requirement that an offender admit to abusing a child before having contact with the child — placed father in a no-win situation and was not reasonably calculated to render him a fit parent who could meet the children's needs. On the one hand, if, as here, father failed to admit that he had abused L.M., this led to termination on the basis that father had not complied with the treatment plan and was unable to have contact with the children or work toward reunification with them. On the other hand, if father had acknowledged that he had sexually abused L.M., this would also be evidence of his unfitness . . . .

*Id.* at ¶¶ 45-46. Given the inherent tensions created by the application of SOMB Standards to a parent who has been accused, but not convicted, of committing a sexual offense, the division held that father's failure to address the allegations of abuse could not support termination of his parental rights. *Id.* at ¶ 50.

27

¶ 53    As noted in *L.M.*, the SOMB Standards place a parent in a dilemma.  If they admit sexually abusing their child, they forfeit their constitutional right to remain silent, potentially face criminal sanctions, and will likely have their parental rights terminated. § 19-3-604(1)(b)(VI), (2)(b), C.R.S. 2021 (a parent is unfit if they have sexually abused their children, and such conduct may form the basis of an order terminating parental rights).  If they do not admit the alleged abuse, they will not successfully complete their treatment plan and therefore face termination of their parental rights.

¶ 54    In addition, as noted in *L.M.*, ¶¶ 43-46, a psychosexual evaluation and resulting treatment protocols are not designed to render a parent fit; instead, they are crafted to treat individuals convicted of sex-related offenses.  Thus, the use of a psychosexual evaluation and treatment under SOMB Standards does not fulfil the basic and essential purpose of the treatment plan — to effectively address the issues that gave rise to the adjudication so that parents and their children can be safely reunited.

¶ 55    Finally, the very structure of SOMB treatment is inconsistent with the core purposes of the Children's Code.  One of the central

objectives of a dependency and neglect action is to safely reunify children with their parents. The central purpose of the SOMB Standards is to protect the public generally, irrespective of the burdens placed on sex offenders or the obstacles that SOMB treatment poses to offenders' relationships with their children. Moreover, the SOMB Standards contemplate a CST, which includes a probation or parole officer, to evaluate an offender and limit their contact with children. In contrast, in a dependency and neglect action the court is in control of whether and when a parent sees their child. This is not a role that a court can delegate to a CST or any other person or entity.

¶ 56 For these reasons, we hold that a parent may not be required, over their objection, to complete an SOMB psychosexual evaluation or SOMB therapy as a condition of their treatment plan if the parent has not been convicted of a qualifying sexual offense.

¶ 57 In reaching this conclusion, we acknowledge that in *L.M.* the division stated "we do not intend to suggest that a court is necessarily prohibited from requiring a parent to participate in psycho-sexual or offense specific evaluations and treatment absent a criminal conviction. Just the opposite, a juvenile court may

29

require such treatment when it is warranted by the record before the court." *L.M.*, ¶ 51. In the first instance, we note that the division cited *C.L.S.* in support of this conclusion. But *C.L.S.* did not address the propriety of requiring an unconvicted parent to complete sex offender treatment under SOMB protocols. *See C.L.S.*, 934 P.2d at 855. Instead, the juvenile court in *C.L.S.* had simply required that the father complete an evaluation "focusing on sexual aggression and that any recommendations pursuant to that evaluation be followed as part of the treatment plan." *Id.* at 856. Thus, the court in *C.L.S.* did not order sex offender treatment under the SOMB.[3]

¶ 58     In addition, we note that, after making the previously quoted statement concerning "offense specific evaluations and treatment," the division in *L.M.* concluded,

> when as here, a parent is acquitted of the criminal charges related to sexual abuse of his or her child and the court cannot find that the abuse occurred by clear and convincing evidence, the parent's failure to admit to the sexual abuse as part of the treatment protocol

---

[3] Indeed, the SOMB Standards were first formulated in 1996, after the juvenile court in *C.L.S.* adopted its requirement that the father complete an evaluation for sexual aggression.

> is insufficient to support termination of parental rights.

*L.M.*, ¶ 52. Thus, we do not read *L.M.* to hold that an unconvicted parent may properly be subjected to SOMB sex offender treatment as part of the treatment plan. And to the extent that *L.M.* can be interpreted as supporting such a conclusion, we respectfully disagree for the reasons previously articulated. *See, e.g., Chavez v. Chavez*, 2020 COA 70, ¶ 13 (a division of the court of appeals is not bound by the decision of another division).

¶ 59 We also acknowledge, however, that an appropriate treatment plan can — indeed, often should — include psychological counseling focused on the problematic behavior of a parent. In cases involving allegations of sexual misconduct or abuse by a parent, such treatment can include evaluation of a parent's sexual proclivities if they interfere with the parent's ability to safely parent their children. To be clear, we do not hold today that a juvenile court may not require a respondent parent to participate in an evaluation and obtain treatment or counseling for sexual behavior that poses a risk to the parent's children. However, in a situation like father's, where the parent has not been convicted of a

31

qualifying sex offense and objects to participating in SOMB treatment, the juvenile court may not require a parent to comply with an SOMB evaluation or treatment pursuant to the SOMB Standards.

¶ 60 As previously noted, the juvenile court made findings of fact grounded in the record to support its conclusion that father needs appropriate psychological counseling and treatment to address his allegedly deviant sexual behavior. On remand, the juvenile court is free to fashion an appropriate order, with the input of additional expert testimony, if necessary, to address and remediate any such deviancies, provided it does not order an SOMB evaluation or treatment.

## V. Conclusion

¶ 61 For the above reasons, we affirm the juvenile court's adjudicatory order, but we vacate the SOMB evaluation and compliance portion of the treatment plan and remand for modification of the treatment plan consistent with this opinion.

JUDGE J. JONES and JUDGE WELLING concur.