24CA0868 Peo in Interest of AG 12-19-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0868
Logan County District Court No. 21JV20
Honorable Stephanie M.G. Gagliano, Judge

The People of the State of Colorado,

Appellee,

In the Interest of A.G. and J.G., Children,

and Concerning R.D.G., II,

Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE WELLING
Brown and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 19, 2024

Alan Samber, County Attorney, Kimberlee R. Keleher, Assistant County Attorney, Sterling, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Beth Padilla, Office of Respondent Parents' Counsel, Durango, Colorado, for Appellant

¶ 1    In this dependency and neglect action, R.D.G. II (father) appeals the judgment terminating his parent-child legal relationships with J.G. and A.G. (the children).  We affirm.

## I.    Background

¶ 2    The Logan County Department of Human Services (the Department) received multiple referrals concerning the children and their older brother.[1]  Two caseworkers went to the family home, where E.G. (mother), father, and the children all reported domestic violence in the home.  The caseworkers told the family that they would come back to the home to offer services.  The Department prepared a safety plan to present to the family to address the concerns about the children's safety.  However, when the caseworker returned, the older brother was at the home alone, and didn't know where the rest of the family had gone or when they would be back.  The Department monitored the situation for several weeks, trying to reach father without success.  The Department obtained temporary custody of the children and then filed a petition

---

[1] The children's older brother was dismissed from the dependency and neglect action when he turned eighteen years old and is not a party to this appeal.

in dependency and neglect, alleging that the children were impacted by domestic violence and educational neglect. The children were located in and removed from Texas, where father remained throughout the action.

¶ 3    The juvenile court adjudicated the children dependent and neglected and adopted treatment plans for both parents. The Department later moved to terminate both parents' parental rights. While the motion was pending, father was arrested for domestic violence, and mother and father separated. The juvenile court entered a civil protective order prohibiting father from contacting mother and restricting father's contact with the children to family time supervised by the Department. The juvenile court bifurcated all hearings after the protective order was entered.

¶ 4    Two years and seven months after the petition was filed, the juvenile court terminated father's parental rights following a four-day contested hearing.

## II. Jurisdiction Under the Uniform Child-custody Jurisdiction and Enforcement Act (UCCJEA)

¶ 5    Father contends that the juvenile court erred by concluding that it had jurisdiction to terminate his parental rights.  We discern no error.

### A.    Standard of Review and Applicable Law

¶ 6    We review de novo whether the juvenile court had subject matter jurisdiction under the UCCJEA.  *People in Interest of S.A.G.*, 2021 CO 38, ¶ 21.  However, we review the factual findings underpinning the court's determination of jurisdiction for clear error and we won't disturb them unless they lack any support in the record.  *Id.*

¶ 7    The UCCJEA "establishes a comprehensive framework that a Colorado court must follow to determine whether it may exercise jurisdiction in a child-custody matter or whether it must defer to a court of another state."  *People in Interest of M.M.V.*, 2020 COA 94, ¶ 17.

¶ 8    A court has jurisdiction to make an initial child-custody determination if, as relevant here, the state is the child's home state.  § 14-13-201(1)(a), C.R.S. 2024.  Colorado is a child's home

state when the child has lived in Colorado "for at least one hundred eighty-two consecutive days immediately before the commencement of a child-custody proceeding," including any "period of temporary absence." § 14-13-102(7)(a), C.R.S. 2024.

## B. Additional Background

¶ 9 At the first shelter hearing, the children's location was unknown. The Department reported that the older brother had been left at the home with family's belongings and "it [didn't] appear as if they're intending to move or relocate." The juvenile court found that Colorado had home-state jurisdiction because the children "have lived in the State of Colorado for over two years, although they are currently out of the state *temporarily*." (Emphasis added.) The juvenile court emphasized that, although there was an emergency situation that justified taking temporary custody of the children, the court wasn't exercising emergency jurisdiction.

¶ 10 The children were located in Texas with the assistance of Texas law enforcement and placed in foster care in Colorado.

¶ 11 Father contested Colorado's jurisdiction throughout the proceedings. The juvenile court held a second shelter hearing at

father's request three months after the first shelter hearing. At that hearing, father asserted that "emergency jurisdiction is an issue today," even though the court was not exercising emergency jurisdiction. Father asserted that the court should hold hearings to confer with courts in Texas (where the children were removed) and Kansas (where there were custody orders for the older brother). At the conclusion of the shelter hearing, the court made oral remarks that home-state jurisdiction couldn't be asserted at that time, an emergency situation existed, and the "court will maintain temporary emergency jurisdiction." The court then issued a brief written order stating that "ongoing jurisdiction is taken under advisement pending additional hearing and/or consultation with Kansas and Texas."

¶ 12    The juvenile court then held a series of conferences with judicial officials from Texas and Kansas. The juvenile court issued a single order for all three children finding "that Colorado has exclusive continuing jurisdiction." The court "follow[ed] the analysis of judges within Colorado, Kansas and Texas" who agreed that Colorado is the children's home state.

## C. Analysis

¶ 13    Father contends that the juvenile court erred by asserting emergency jurisdiction. But the juvenile court was clear that it wasn't asserting emergency jurisdiction at the first shelter hearing when the initial child-custody determination was made. And, although the court made oral remarks after the second shelter hearing regarding emergency jurisdiction, those remarks weren't formally adopted by the court in its written order following the hearing. *See People in Interest of O.J.S.*, 844 P.2d 1230, 1233 (Colo. App. 1992) ("[T]he court has the authority to supplement and modify the opinions it expressed in its oral remarks until the date judgment formally enters."), *aff'd sub nom., D.A.S. v. People*, 863 P.2d 291 (Colo. 1993). The court based its final determination of jurisdiction on an analysis that Colorado had, and maintained, home-state jurisdiction — not emergency jurisdiction. Thus, we reject father's premise that the court asserted emergency jurisdiction.

¶ 14    Father next asserts that Colorado couldn't be the children's home state because the children were removed from Texas and therefore were not in Colorado "immediately before the start of the

proceeding." Rather than dispute the juvenile court's initial finding that the children were outside Colorado as part of a temporary absence, father appears to simply ignore the statutory guideline that directs Colorado to retain home-state jurisdiction when a child is absent from the state for a "period of temporary absence." *See* § 14-13-102(7)(a). We won't follow him down that path.

¶ 15      The record supports the court's finding that, at the time the juvenile court granted temporary custody of the children to the Department, the children had been in the state of Colorado for more than the required one hundred eighty-two days including a temporary absence. Father testified that the family had been living in Colorado for more than six years before the first shelter hearing. The intake caseworker testified that the family never alluded to leaving the state when he met with them at their home. Instead, when the caseworker told father that he would be returning "[father] said that [he] would appreciate it" and seemed receptive to enrolling the children in school in Colorado. When the caseworker returned, the older brother reported he thought father "wouldn't have left him by himself indefinitely without telling him goodbye." The children's other brother who lived next door testified that he didn't know that

father and the children were planning to leave or where they went. Father was unclear in his communication with the adult brother about where the family was going, and at one point father indicated that the family was somewhere in Oklahoma.

¶ 16    At different times during the dependency and neglect action father testified both that he "wanted to move back to [Colorado] from the very start" and that he intended to permanently stay in Texas. At the second shelter hearing, father testified that his car was registered in Colorado, he maintained a bank account in Colorado, and the billing address for his cell phone and insurance were the family's home address in Colorado. At the termination hearing, father testified that he maintained employment in Colorado until several weeks after the family first left the state.

¶ 17    Given this record, the juvenile court properly asserted home-state jurisdiction at the first shelter hearing and maintained that jurisdiction throughout the proceedings. *See S.A.G.*, ¶ 39 n.3 ("[I]n Colorado, a motion to terminate parental rights after a child has been adjudicated dependent and neglected is a request for a remedy, not the start of a second proceeding."). To the extent that the court erred by making other jurisdictional findings between its

first assertion of home-state jurisdiction and its final jurisdictional orders, any error was harmless, as nothing about those subsequent findings undermines the propriety of the court's initial finding of home-state jurisdiction.

## III. Expert Testimony

¶ 18 Father next contends that the juvenile court erred by allowing the caseworker to testify as an expert and, as part of that testimony, opine that his parenting time was harmful to the children. We disagree.

### A. Standard of Review and Applicable Law

¶ 19 Father claims that the caseworker's testimony infringed on his due process rights and should be reviewed de novo. However, it is well settled that the resolution of discovery issues, including the sufficiency of disclosures and the admission of expert testimony, are subject to review for an abuse of the juvenile court's discretion. *People in Interest of S.L.*, 2017 COA 160, ¶ 67; *People in Interest of A.N-B.*, 2019 COA 46, ¶ 9. An abuse of discretion occurs only when the juvenile court's decision is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *Id.* When a court admits or excludes evidence, any error in its ruling is harmless unless it

9

affects a substantial right of the party.  CRE 103(a)(1); *see People v. Quillen*, 2023 COA 22M, ¶ 14.

## B.    Expert Testimony

¶ 20    Under C.R.C.P. 26(a)(2), a party must disclose to other parties any person who may be called to present expert evidence at trial and must also identify the person's fields of expertise.  If the witness is a "retained expert," defined as one "who is retained or specially employed to provide expert testimony, or whose duties as an employee of the party regularly involve giving expert testimony," the disclosure must be made by a written report as required under C.R.C.P. 26(a)(2)(B)(I).  If, on the other hand, the expert witness is not a "retained expert," the disclosure *may* be made in a written report as required under C.R.C.P. 26(a)(2)(B)(II).  For the purposes of C.R.C.P. 26(a)(2), non-retained experts include "occupational experts, such as treating physicians, police officers, or others who might testify as experts but whose opinions are formed as part of their normal occupational duties."  *Gall v. Jamison,* 44 P.3d 233, 234 n.2 (Colo. 2002); C.R.C.P. 26 cmt. 8.

¶ 21    At the time of the termination hearing, the disclosure and discovery rules set forth in C.R.C.P. 26 could apply to dependency

and neglect actions when ordered by the juvenile court.  C.R.C.P. 26(a); *People in Interest of K.T.*, 129 P.3d 1080, 1082 (Colo. App. 2005).[2]  Here, the juvenile court maintained a standing case management order requiring parties to comply with the "automatic disclosure requirements" in C.R.C.P. 16.2(e) for domestic relations cases, which includes Rule 16.2(e)(3), which in turn incorporates C.R.C.P. 26(a)(2)(B)'s expert disclosure requirements.  As discussed below, Rule 26(a)(2)(B) contains different disclosure requirements for "retained experts" verses "other experts."  Moreover, the case management order prohibited the filing of "narrative case summaries, case histories, and investigative reports, termination hearing reports, and adjudication hearing reports, prepared by caseworkers . . . except upon motion and order of the court" and provided that "[u]nsolicited reports of caseworkers prepared for the apparent purpose of advocating . . . termination of parental rights are highly discouraged."

---

[2] After the termination hearing in this case, Juvenile Procedure Rule 4.6 took effect.  Rule 4.6 now broadly governs disclosure and discovery in dependency and neglect actions.

11

¶ 22    In anticipation of the termination hearing, the Department disclosed several caseworkers as expert witnesses.  In accordance with the plain language of the case management order, the Department didn't file any "termination hearing reports . . . prepared by the caseworkers."  The first day of the termination hearing, father filed a motion in limine asserting, as relevant here, that "because the department employee's duties, listed as expert witnesses, involves giving expert testimony, they are required to provide a report."  Father asked the court to "strike or disqualify all the experts" as a sanction.

¶ 23    When the Department asked the court to recognize the casework supervisor as an expert, father conducted an extensive voir dire.  In response to father's questions whether "testifying as an expert [was] a regular duty" in her position, the casework supervisor responded that testifying wasn't "regular," although she was aware that being called to testify "could happen."  She estimated that over the course of sixteen years, she had been called to testify as an expert less than once per quarter.  Father also asked questions, in counsel's terms, "trying to identify what is child welfare.  If she's an expert in child welfare . . . I'm not sure exactly

12

what that means." The county attorney referenced the witness disclosures and argued that the statements listed there related to permanency, the appropriateness of the treatment plan, and the likelihood that a parent would change in a reasonable period of time were included in the proposed "broad child welfare" qualification. Father agreed that the caseworker "could probably talk to permanency" but disagreed that an expert opinion on that subject was necessary or appropriate.

¶ 24 After voir dire, father objected to the casework supervisor being qualified as an expert in child welfare, citing both "the term" child welfare and the content of the expected testimony, which father argued "relate[d] to the case and her experience in the case, not necessarily an opinion that might help the court."

¶ 25 Over father's objection, the juvenile court recognized the casework supervisor "as an expert based on her education, training, and experience in the areas of addressing child safety, the development of treatment plans, incorporating services, and in assessing permanency for children."

¶ 26 Father first contends that the juvenile court erred by recognizing the casework supervisor as an expert when no report

was provided under C.R.C.P. 26(a)(2)(B)(I). The Department and GAL contend that this objection wasn't preserved. In a general discussion of father's motion in limine, the court and parties referenced determinations by the court in other cases that employees of the Department weren't experts retained for the purposes of litigation. Father didn't include this issue in his extensive objection during the termination hearing when qualification of the casework supervisor was being sought. *See People v. Salas*, 2017 COA 63, ¶ 29 (While "[w]e do not require that parties use 'talismanic language' to preserve particular arguments for appeal, . . . the trial court must be presented with an adequate opportunity to make findings of fact and conclusions of law on any issue before we will review it."). Thus, it's doubtful that the contention father advances on appeal was preserved in the juvenile court. *See People in Interest of M.B.*, 2020 COA 13, ¶ 14 ("[G]enerally appellate courts review only issues presented to and ruled on by the lower court.") (citations omitted).

¶ 27    In any event, even if father's objection was properly preserved, the casework supervisor's testimony during voir dire made clear that providing expert testimony wasn't a regular duty of her

14

employment with the Department. *Cf.* C.R.C.P. 26(a)(2)(B)(I) (defining a retained expert as someone "whose duties as an employee of the party regularly involve giving expert testimony"). Thus, because she wasn't a retained expert, the requirements of C.R.C.P. 26(a)(2)(B)(I) didn't apply to the pretrial disclosure of her testimony.

¶ 28 Father also contends that the casework supervisor's "area of expertise [was] expanded by the court" and, as a result, she was permitted to opine that family time with father was harmful to the children. But the record reflects that the casework supervisor's area of expertise was modified as a direct result of father's suggestion that "child welfare" was undefined and too nebulous. If anything, the court narrowed the area of expertise to specific topics within child welfare. Given these circumstances, we discern no error in the juvenile court's recognition of the casework supervisor as an expert in "the areas of addressing child safety, the development of treatment plans, incorporating services, and in assessing permanency for children."

## IV.   Records from Kansas

¶ 29    Father next contends that the juvenile court erred by admitting a summary of his history with the Kansas Department for Children and Families.  The summary included reports of domestic violence between father and the mother of his adult children.  But father doesn't assert, and our review of the court's judgment doesn't suggest, that the juvenile court relied on the records from Kansas in any way.  *See* C.R.C.P. 61 (noting that an appellate court may disregard any error "which does not affect the substantial rights of the parties"); *see also People in Interest of M.V.*, 2018 COA 163, ¶ 66 ("An error affects a substantial right if it can be said with fair assurance that it substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.") *overruled on other grounds by People in Interest of E.A.M. v. D.R.M.*, 2022 CO 42.  True, the Department asserted that the Kansas records were relevant to the court's determination of father's fitness under the Children's Code.  *See* § 19-3-604(2)(c), C.R.S. 2024 ("In determining unfitness . . . the court shall consider, but not be limited to . . . [a] [h]istory of violent behavior[.]").  But even if the court erred by admitting and considering the Kansas records for this purpose, any error was

16

harmless because the information in the Kansas records was cumulative. *See M.V.*, ¶ 67 (noting that an erroneous evidentiary ruling is harmless if the inadmissible evidence is cumulative).

¶ 30     At the termination hearing, mother testified at length about father's violence towards her, the children, and the family's animals. Mother testified that father's violence towards her had been going on for at least ten years. Mother described a number of violent incidents in detail, including a time father slammed her into a wall and strangled her until A.G. said, "you killed my mom." Father himself testified that he "did resort to physical violence" and that he was "unable to restrain [him]self on multiple occasions." Father recounted what he called "the choking incident," and testified that A.G. said, "stop killing my mom." Father testified that mother went to the hospital twice because of injuries sustained during altercations with him.

¶ 31     In addition to testimony taken at the termination hearing, the juvenile court was aware of circumstances surrounding the temporary protective order that it entered six months before the termination hearing. The police report detailing the domestic

violence incident that prompted the request for the protective order was also admitted at the termination hearing.

¶ 32    The juvenile court found that father had a history of violent behavior as relevant under section 19-3-604(2)(c).  There is ample record support for this finding without considering the Kansas records that father now contends were admitted in error.  Thus, any erroneous admission of the Kansas records was clearly harmless.

## V.    Less Drastic Alternative

¶ 33    Father's next contention is that the juvenile court erred by finding there was no less drastic alternative because it was "not necessary to terminate [father's] parental rights when mother was maintaining hers."  The juvenile court didn't err in this regard.

¶ 34    Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must consider and eliminate less drastic alternatives.  *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo. 1986).  In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs.  § 19-3-604(3).  A juvenile court may consider and weigh various factors in determining the viability of a less drastic alternative, including whether an ongoing

relationship with the parent would be beneficial or detrimental to the child. *People in Interest of B.H.*, 2021 CO 39, ¶ 81.

¶ 35     Here, the juvenile court found "it is not routine that only one parent's rights are terminated; however, these parents are in very different circumstances" from each other. The court found it could "point to no benefit of maintaining the [children's] relationship with father that is not outweighed by its termination regardless of mother's status." The court found that "in these unique circumstances, it is in the best interests of the children to terminate the parent-child legal relationships between father and each child. . . . [T]here is no less drastic alternative to termination of father's parental rights when given primary consideration to the physical, mental, and emotional conditions and needs of these children."

¶ 36     The record supports these findings.

¶ 37     Father's interactions with the children during family time had deteriorated. Over the two and a half years the action was open, father came to Colorado for family time only eight times, despite findings by the juvenile court that in-person family time was better for the children given their special needs. Father had inappropriate conversations with the children during family time, especially after

his separation from mother. The caseworker testified that there was no benefit to father "remain[ing] in the picture." The casework supervisor opined that ongoing contact with father would be "detrimental" to the children.

¶ 38 The record supports that father would be unlikely to comply with allocation of parental rights (APR) orders. The caseworker testified that father hadn't complied with rules for safe and appropriate family time at any point during the case and was unlikely to follow court orders around family time in the future. The psychologist who conducted the parent-child interactional assessment with the family opined that father would not "be easy to coparent with" and that he would have concerns about the children's safety if the court ordered an APR and father maintained his parental rights. The casework supervisor opined that she didn't "believe [father would] follow court orders and [she didn't] feel like it would be a safe setting for any of them to have an [APR] in place."

¶ 39 Most importantly, the children needed permanency that only termination of father's parental rights could provide. The casework supervisor and the psychologist both opined that keeping the action open was impacting the children; the psychologist described A.G. as

being "highly aware and highly anxious and agitated and asking for help" to not be in the middle of the action. The psychologist testified that both children had "significant needs" and that J.G. was "essentially non-verbal." The casework supervisor opined that nothing short of termination would provide permanency because the children would continue to be "put in the middle" by father. The caseworker testified that "these children need permanency. And at this point, their father has not been able to provide a safe and stable environment."

¶ 40 Parental rights are personal between each parent and each child. *People in Interest of J.L.M.*, 143 P.3d 1125, 1127 (Colo. App. 2006). "[I]n deciding whether to terminate or whether less drastic alternatives exist, a trial court may recognize differences between the parents . . . and base its decision upon the best interests of the children." *Id.* Here, there is ample support in the record for the juvenile court's determinations that father and mother were differently situated, and that termination of father's parental rights was in the children's best interests.

## VI. Continuance

¶ 41 Finally, father contends that the juvenile court erred by denying his motion for a continuance for more time to depose mother. Again, we disagree.

¶ 42 Motions for continuance are left to the sound discretion of the juvenile court, and its rulings will not be disturbed on appeal absent a clear abuse of that discretion. *People in Interest of A.J.*, 143 P.3d 1143, 1150 (Colo. App. 2006). The court must balance the need for an orderly and expeditious administration of justice against the facts underlying the motion, considering the children's need for permanency. *Id.* When, as here, the action is subject to expedited permanency planning guidelines, a juvenile court "shall not grant a delay unless good cause is shown and unless the court finds that the best interests of the child will be served by granting a delay." § 19-3-602(1), C.R.S. 2024.

¶ 43 Father requested and received a continuance of four months before the termination hearing was held so that he could conduct a deposition of mother. At the start of the termination hearing, father's counsel requested a second continuance because "scheduling became very difficult." Although father conceded that

the content of mother's testimony "won't necessarily be [a] surprise," he asserted that a deposition was necessary to challenge mother's credibility. Both the Department and guardian ad litem objected to a continuance, asserting that the children needed permanency as soon as possible.

¶ 44 The juvenile court denied father's second request for a continuance. The court found that mother's testimony wouldn't be a surprise because her "change in position was made clear after" the domestic violence incident that resulted in the civil protective order and the bifurcation of hearings. The court noted that the termination motion was filed nearly a year before and that father had enough time to prepare. Given the circumstances, the court's determination was not manifestly arbitrary, unreasonable, or unfair, nor did it misapply the law. We therefore discern no abuse of discretion in the court's denial of father's request for an additional continuance.

## VII. Ineffective Assistance of Counsel

¶ 45 In the alternative, father asserts that he received ineffective assistance of counsel because the deposition of mother didn't occur before the termination hearing. This claim also fails.

¶ 46    To successfully make an ineffective assistance of counsel claim, a parent must show: (1) counsel's performance was outside the wide range of professionally competent assistance, and (2) the parent was prejudiced by counsel's errors. *A.R. v. D.R.*, 2020 CO 10, ¶ 48; *People in Interest of C.H.*, 166 P.3d 288, 291-92 (Colo. App. 2007).

¶ 47    But father doesn't assert, and the record doesn't suggest, that the failure to complete the deposition before the termination hearing was due to counsel's deficient performance. To the contrary, statements made by the other parties revealed that father's counsel had attempted, multiple times, to schedule the requested deposition. Father's counsel reported that the attorneys "tried in good faith to try and get that hammered down," but not all parties were available for the dates that had been cleared with mother. Because there is no assertion or indication that father's counsel's "performance was outside the wide range of professionally competent assistance," father's ineffective assistance claim must fail.

## VIII.  Disposition

¶ 48    The judgment is affirmed.

JUDGE BROWN and JUDGE MOULTRIE concur.